LEWIS TIPPETT v. THE STATE.

*No. 1179.   Decided February 17th, 1897.*

1. **Impeachment of Witness, as to His Antecedents, on Cross-Examination—His Right to Explain on Cross-Examination.**

   Where, on cross-examination of a witness for the defendant, the State, for the purpose of discrediting his testimony, has elicited from him the fact, that there were three indictments then pending against him for cattle theft; and, on his re-examination, defendant proposed, in explanation of this matter, to prove that he, witness, had purchased, and was a bona fide purchaser of each of the three animals he was charged with stealing by said indictments; which proof, on objection by the State, the court refused to permit him to make. Held: Error.

2. **Same.**

   Where it is attempted, on cross-examination, to discredit the testimony of a witness by proving his antecedents in connection with criminal acts charged against him. Held: On his re-examination the witness should be permitted to show such explanatory circumstances, in connection with the matter inquired about, as would go to remove the implication of untruthfulness, and serve to reinstate his credit. The accusation, with the explanation made by the witness, should both be before the jury when passing upon his credit, especially where the testimony of such witness is important and material in support of the theory of the defendant in the case.

3. **Murder—Drunkenness—Charge.**

   Drunkenness, produced by the recent use of intoxicating liquors, is no defense to murder in the second degree. And, where the court, in its charge, in one breath tells the jury, that temporary insanity superinduced by the recent use of intoxicating liquor was no defense, except to reduce the punishment, or to reduce the degree from murder in the first to murder in the second degree, and, in the next breath,

tells them it is a complete defense, the charge is antagonistic and confusing. But, Held: Defendant is in no condition to complain, as he was convicted of murder in the second degree.

APPEAL from the District Court of McLennan. Tried below before Hon. SAM R. SCOTT.

Appeal from a conviction for murder in the second degree; penalty, ten years' imprisonment in the penitentiary.

The indictment charged appellant with the murder of Cue Westbrook, on the 1st day of April, 1893, by shooting him with a gun.

The material facts attendant upon the killing are stated in the opinion. Nor, is it necessary to add anything to the statement in the opinion as to the matters pertaining to the exclusion by the court of the testimony sought to be elicited on the re-examination of the witness, Ragland, explanatory of the discrediting testimony given by him on his cross-examination, as to the indictments pending against him.

*Samuel H. Clayton*, for appellant.—With regard to the exclusion of the explanatory testimony of the witness, Ragland, upon his re-examination, submitted the following propositions: If the State introduce evidence irrelevant or collateral to the main issue, which is prejudicial and harmful to the defendant, the latter is entitled to introduce evidence that will directly and strictly contradict it, in order to enable the defendant to explain away the injurious effect of the evidence, which in many instances cannot be cured by the charge of the court. 1 Thompson on Trials, Sec. 483; State v. Ezell, 41 Texas, 35.

Where, on cross-examination of a witness, collateral facts are called out from him tending to create a distrust in his integrity, fidelity or truth, it is competent for the adverse party to ask on re-examination an explanation which will tend to support his testimony although the circumstances thus proved are foreign to the main issue. 1 Thompson on Trials, Sec. 475 (citing U. S. v. 18 Bbls. of High Wines, 8 Blatchf. [U. S.], 475, 478).

A defendant when on the witness stand is governed by the same rules as other witnesses, and it is improper to refuse the accused, as a witness, to state the circumstances affecting the finding of an indictment against him, hence a like applicability of the rule to a defendant's witness. 1 Thompson on Trials, Secs. 642, 643.

*Mann Trice*, Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and given ten years in the penitentiary, and prosecutes this appeal. Appellant and deceased lived in the country, several miles from the city of Waco, on the same farm or inclosure, 200 or 300 yards apart. On the day of the homicide, both had been to Waco, and, on their return home in the evening, the testimony indicates that both were under the influence of liquor. They were seen by parties on the way

home from Waco to their homes quarreling, and, when they got near their respective homes, the testimony shows that both parties stopped at one Prince Tippett's house, and they had two fights there, in which the deceased evidently, on both occasions, got the better of the defendant. Prince Tippett's house is situated on one side of the railroad, and across, on the other side, are the houses of the defendant and deceased. After crossing the railroad going from Prince Tippett's, there was a gate opening into the farm or inclosure where defendant and deceased lived. Defendant lived some 30 or 40 yards from this gate, and deceased 200 or 300 yards beyond, in the same direction; that is, in going from said gate to the deceased's house, along a turnrow, one would have to pass near the house of the defendant. There was a little path from said turnrow leading to defendant's house. After the difficulties at Prince Tippett's between the parties, the defendant appears to have gone on home. A short time thereafter, deceased started to his home. His little boy, about 10 years of age, was with him; and deceased was leading his horse, having in his hands at the time some chickens and a can. The little boy was riding the horse. The deceased opened the gate and lead the horse in; and about this juncture the defendant, with a gun in his hand, came off his gallery around the lot, which is at the side of the gallery, and which fronted the path deceased was traveling towards his home, and said to deceased: "Come on. I am ready." The deceased proceeded by the turnrow, and, when he got to where the path turned off from the turnrow towards the defendant's house, he proceeded up that path. According to some of the witnesses, he waved his left hand over his head, and had his right hand behind him. He got within a few feet of defendant, when defendant fired and killed him. According to the defendant's witnesses, when defendant came out with the gun deceased said to his boy and others who were standing around there: "Watch me, boy, what I am going to do. I am going to make him eat up that gun." And they further stated that when deceased turned off the turnrow, on to the path that led to where defendant was, defendant had his gun in his hand, with the muzzle pointing down, and, when deceased approached near defendant, he told him to stop or he would kill him, and, when deceased got nearly within reaching distance of the defendant, he raised his gun and fired, killing deceased. There is some testimony in the record showing, on the part of the State, some threats made against deceased that afternoon by the defendant, before he reached home. Ed Rowe says: "Defendant tried to borrow a gun or a pistol from him, and he said he wanted to kill the deceased; that he did not allow anybody to talk about his brother's daughter; and that he was going to wake up things that night, and, if he did not let him have his gun or pistol, that he had one at home that never failed." There is some testimony in the record, from the defendant's witnesses, showing that deceased had a pistol that evening, and one or two of the witnesses testified that he had a pistol at the time he was killed. No pistol, however, was found on the deceased's

person, or near where he was killed, by those who reached the body shortly after the killing, and who testified in the case on this subject. The testimony does not show, in the difficulties which occurred at Prince Tippett's house, who was the agressor, but it is shown that in both fights deceased got the better of the defendant. In both instances the testimony indicates that deceased got defendant down and was choking him, and was pulled off of defendant by other parties. On the trial of the case, appellant reserved a bill of exceptions to the action of the court in excluding the testimony of Steve Ragland, explanatory of testimony drawn from said witness by the State, on cross-examination, to the effect that there were three indictments then pending against said witness for the theft of three head of cattle; the contention of the defendant being that Steve Ragland was an important witness on defendant's behalf, and that the purpose and object of the State was to impeach said witness' credit before the jury by proving that he was then under indictment for cattle theft, and, in order to meet this proof and dissipate the imputation thus made to rest upon said witness, he ought to have been permitted to prove by said witness that the three cattle he was charged with having stolen under three separate indictments were all bona fide purchases by him from one Jeff Green, and that he paid a valuable price therefor, and did not even know they were stolen property at the time he purchased them. The court excluded this testimony, and appellant claims that it was error. He furthermore appends to his motion for a new trial the certificate of the district clerk showing that said Ragland had, since the conviction of defendant, been tried on said charges of cattle theft, and acquitted in one case, and the other two cases dismissed; and he claims that a new trial should have been granted, so that he might have availed himself of this testimony. The question of the admissibility of the character of testimony offered by the State to impeach the witness, Ragland, has been heretofore discussed by this court. In some of our States it is held that testimony showing that a witness is under a charge of a criminal offense is not admissible for the purpose of impeaching him, on the ground that until there is proof of conviction the witness is protected by the legal presumption of innocence. In Carroll v. State, 32 Tex. Crim. Rep., 431, this character of evidence was held admissible in this State; and see the question also discussed in Brittain v. State, 36 Tex. Crim. Rep., 406. So we take it that it is now well settled that the State can introduce this character of testimony for the purpose of impeaching a witness. But the question is now presented, we believe, for the first time, in this court, whether or not, after the State has, in the first instance, on cross-examination, adduced this impeaching testimony, it is permissible for the defendant, on the re-examination of said witness, to show the groundlessness of the charge contained in the indictment. The reason of the ruling for authorizing this character of testimony to impeach a witness on behalf of the State is well expressed by Campbell, judge, in Wilbur v. Flood, 16 Mich., 43, 8 Crim. Law

Mag., p. 86.   He says: "It has always been found necessary to allow witnesses to be cross-examined, not only upon the facts involved in the issue, but also upon such collateral matters as may enable the jury to appreciate their fairness and reliability.   To this end a large latitude has been given, where circumstances seem to justify it, in allowing a full inquiry into the history of witnesses, and in many other things tending to illustrate their character.   This may be useful in enabling the court or jury to comprehend just what sort of person they are called upon to believe, and such knowledge is often very desirable.   It may be quite as necessary, especially where strange or suspicious witnesses are brought forward, to enable counsel to extract the whole truth from them on the merits.   *   *   *   It has always been held a witness may, on cross-examination, within reasonable limits, be very thoroughly sifted upon his character and antecedents.   The court has a discretion as to how far propriety will allow this to be done in a given case, and will or should prevent any needless or wanton abuse of the power.   But, within this discretion, we think a witness may be asked concerning all antecedents which are really significant, and which will explain his credibility and it is certain that proof of punishment in a State prison may be an important fact for that purpose.   And it is not very easy to conceive why this knowledge may not be as properly derived from the witness as from other sources.   He must be better acquainted than others with his own history, and is under no temptation to make his own case worse than the truth will warrant.   There can be with him no mistake of identity. If there are any extenuating circumstances, no one else can so readily recall them.   We think the case comes within the well-established rule of cross-examination, and that the few authorities which seem to doubt it have been misunderstood, or else have been based upon a fallacious course of reasoning, which would, in nine cases out of ten, prevent an honest witness from obtaining better credit than an abandoned ruffian." Upon the point now before us, we call attention to the expressions used in the latter part of the above quotation, to-wit:   "He must be better acquainted than others with his own history, and is under no temptation to make his own case worse than the truth will warrant.   *   *   *   If there are any extenuating circumstances, no one else can so readily recall them."   Rice, Ev., § 372, has the following:   "Among the stereotyped questions propounded to a witness with the view of impairing his credit, is this: 'Were you ever arrested and convicted of such a crime?' (naming the crime).   In the vast majority of instances, the interlocutor has previous knowledge of the facts, and the reply elicited is almost invariably in the affirmative.   This naturally creates unfavorable presumptions.   It is a matter of no small importance to the criminal bar of this country to know that relief may be afforded, in part at least, from these unfavorable impressions, by eliciting, upon redirect examination, testimony from the witness declaratory of his innocence of the crime charged; and this, too, although the record of his conviction be produced"—citing Sims v. Sims, 75 N. Y., 467, and Wolkoff v. Tefft

(Super. Ct.), 12 N. Y. Supp., 464. In our opinion, it would be ex-ceedingly unfair to authorize the State, by this method of cross-examination, to impeach a witness by showing that he was then under a criminal charge or accusation, and not permit the defendant, in order to bolster his witness against such an assault, to show by said witness any circumstance or explanation that would go to relieve the witness of the imputation of untruthfulness or want of credit thus cast upon him by the State. We would not be understood as holding that the court would be authorized to enter into an investigation of the merits of this collateral issue, but we do hold, where this method of impeachment of a witness is resorted to on cross-examination, that, on the re-examination of the same witness, defendant should be permitted to show such explanatory circumstances, in connection with the matter inquired about, as would go to remove the implication of untruthfulness, and serve to reinstate the witness. This case is an apt illustration of the fairness of the rule. Here, in order to discredit the witness, the State was permitted to show that he was under indictment for the theft of three head of cattle. This left the witness under a cloud. He should have been permitted to state on his re-examination that he was a bona fide purchaser of said cattle, and had not stolen them. The accusation, with the explanation made by the witness, would then all be before the jury, who, in passing upon his credit, would take all the facts into consideration. If the testimony of the impeached witness was of an unimportant or immaterial character, the refusal of the court to permit this testimony might not afford a ground for a reversal of the case, but it occurs to us that the testimony of said witness was of a material character. The defendant proved by said witness: That he met defendant and deceased on the evening of the homicide, as they were coming from Waco, and as he was going to Waco. When he first saw them, they were quarreling, and he heard deceased tell the defendant that, if he did not take it back, he would kill him. Both were under the influence of whiskey, and had a bottle with them. That he had a drink of it. While they were quarreling, Lewis Tippett said he would fight deceased with his fist, and deceased said (pointing to his hip) he would use this means. That he saw a pistol in the pocket of the deceased at the time. That he stopped and talked with the parties eighteen or twenty minutes, and that they were then on their way home, about one and one-half or one and three-fourths miles from their homes. That when he left them they were still quarreling. On the trial of the case it was a disputed question as to whether deceased had a pistol or not at the time of the homicide. One or two of the witnesses testified that he did have a pistol, and deceased's wife testified that he did not own a pistol at all; and several witnesses testified that they reached the body soon after deceased was killed, and found no pistol on or about him. While, as we understand the record, under the circumstances of this case, there was no self-defense, yet, according to the State's theory of the case, deceased was not armed with a pistol, and was making

no demonstration as if to use a pistol; and this theory would indicate, not only an indefensible homicide, but a killing in which an unfair advantage was taken by the slayer. The defendant's testimony, from one point of view, would suggest a mutual combat, and the endeavor on the part of the appellant was to show that the deceased was armed at the time, and was in the act of using a deadly weapon; and he was entitled to all of the testimony that would reinforce this theory, if it would serve no other purpose than to go to the mitigation of whatever penalty the jury might inflict. The testimony of the witness, Ragland, was material, in this aspect of the case. It strongly tended to corroborate the defendant's witnesses as to the fact that deceased was armed with a pistol at the time of the homicide, and that the defendant knew or believed that he was so armed; and, in our opinion, after the testimony of this witness was impeached by the State the court committed a material error in not allowing testimony on his reexamination which would tend to explain this impeaching testimony, and to reinstate his credit with the jury. There was proof offered in this case tending to show that defendant was greatly under the influence of liquor at the time of the homicide, and the court gave a charge on this subject in accordance with the decision of this court in Evers v. State, 31 Tex. Crim. Rep., 318. The appellant, by his counsel, criticises this charge, but we see no occasion to change our holding on this subject. In addition, however, to said charge, the court further instructed the jury as follows: "But if you find that, at the time of the killing, defendant's mind was in such a condition, from the recent use of intoxicating liquor, that it was incapable of forming and entertaining a criminal intent, then, if you so find, or if you have a reasonable doubt thereof, you will acquit him." This charge, as we regard it, is in direct contravention of the charge which had already been given by the court. The jury had already been instructed that temporary insanity, superinduced by the use of intoxicating liquor, would only serve to mitigate the punishment, or to reduce the degree from murder in the first to murder in the second degree. Now, if he was temporarily insane, he would not be capable of forming a criminal intent. By this charge the court, in one breath, tells the jury that temporary insanity, superinduced by the recent use of intoxicating liquor, was no defense, except to reduce the punishment, or to reduce the degree from murder in the first to murder in the second degree, while in the next breath he tells them that it is a complete defense. These charges were evidently antagonistic, and the result must have been to leave the jury in a confused state; that is, as having no certain idea as to what the law was on this subject. However, we do not believe that the appellant is in a condition to complain, as he was not entitled to the latter portion of it under any state of case, and he evidently had the full benefit of the first portion of the charge. All of the authorities concur in holding that drunkenness produced by the recent use of intoxicating liquors is no defense to murder in the second degree. Appellant was not convicted of murder in the first degree.

The court charged the jury that they could look to the fact of intoxication in mitigation of the punishment, even of murder in the second degree, if they should so find. Under this conviction, this was all that he was entitled to. If appellant had been convicted of murder in the first degree, his contention might have some force. For the error of the court in excluding the testimony of the witness, Ragland, heretofore discussed, the judgment is reversed, and the cause remanded.

*Reversed and Remanded.*