[Crim. No. 611.   Second Appellate District.—October 30, 1918.]

## THE PEOPLE, Respondent, v. WILLIAM BAILEY, Appellant.

CRIMINAL LAW—MURDER—EVIDENCE INSUFFICIENT.—In this prosecution for murder, a verdict finding the defendant guilty of manslaughter was unsupported by the evidence, which was purely circumstantial and of such an unsubstantial nature as to amount to no proof at all.

APPEAL from a judgment of the Superior Court of Imperial County. J. W. Curtis, Judge Presiding.

Conkling & Brown, for Appellant.

U. S. Webb, Attorney-General, and Joseph L. Lewinsohn, Deputy Attorney-General, for Respondent.

JAMES, J.—Appeal from a judgment directing the imprisonment of the defendant in the state penitentiary.

Appellant was charged by an information of the district attorney with the crime of murder, alleged to have been committed on or about the fifteenth day of December, 1917, in the county of Imperial. There were two trials, the jury having disagreed at the first and upon the second returned a verdict of manslaughter, carrying the recommendation that there be imposed "the minimum sentence." In view of the point made by appellant that the evidence was insufficient to sustain the conviction, we will relate the story of the crime, as the evidence shows it, with considerable detail, giving particular emphasis to all of the testimony introduced on behalf of

the prosecution which, it is claimed, tends to show the defendant's guilt: On December 15, 1917, appellant was the owner of a small store at a little place called Rockwood, in Imperial County. The deceased was a friend of the defendant and resided alone in a small house or cabin a short distance away from the store—just how far does not appear. The deceased took his meals with appellant at the store. Another man, named Curran, was at the time residing with the defendant at the store. No other persons lived at that place. There was an apartment in the rear of the storeroom where there was a bed in which the men slept, and it was also in the rear part of the building that they prepared and ate their meals. At about 12 o'clock on the night preceding the alleged murder, a trapper, named Moore, knocked at the door of the store and awakened appellant. At the request of the trapper, Bailey went out and assisted him in finding a sack which he had brought on the stage with him and which he had mislaid in the darkness. This sack contained some vegetables and two quart bottles of intoxicating liquor, one being corn whisky and the other pure alcohol. The trapper remained through the night and at least through the larger portion of the next day. All of the three men, Curran, Moore, and appellant, were in the habit of using intoxicants to excess, as was also deceased. The three men first mentioned, after the arrival of the trapper, had some drinks, and on the following morning they again partook of the liquor, at least appellant and Curran did. At that time they used the pure alcohol, diluted with water, into which was mixed sugar. At the time for the morning meal on the 15th appellant went to the house of deceased and brought him over to the store to have breakfast. Later on, in the morning, at perhaps about 10 o'clock, deceased and Curran went to a ranch owned by the deceased, which was located some distance out of the town of Rockwood. They returned from there between 12 and 1 o'clock, deceased going to his cabin and Curran returning to the store of appellant. No witness saw Curran or the deceased at the time the latter reached his cabin, and from this point on, up to the time of the discovery of the dead body of deceased in his cabin, between 3 and 4 o'clock of the same afternoon, the story as to the movements of Curran and appellant is somewhat in dispute. It was several weeks after the alleged murder that appellant was arrested and charged with the crime, and up to the time of

the first trial Curran was held as a witness in the custody of the sheriff in default of bond. After the first trial he was released, and it appears that he promptly disappeared, and the sheriff was unable to find and subpoena him when the second trial came on. His testimony, as given at the first trial, was read in evidence from the reporter's transcript, and it was this testimony that the prosecution mainly relied upon in the effort to fix the crime upon appellant. We will proceed to the narrative of this testimony so given by Curran. The witness stated that upon returning from the ranch with deceased he left deceased at the latter's cabin and went on to the Bailey store; that he found Bailey seated at a table in the rear of the store, with the trapper, Moore, with a bottle of whisky before them, a portion of which had been consumed; that he found the empty bottle which he presumed had contained the alcohol lying on the floor, and this he threw away. Curran stated that he was pretty well intoxicated at the time; he felt badly; that he proceeded to the rear of the store, where the bed was, and lay down; that appellant came back where he was and remarked aloud that Curran had gone to bed, and then took a cover of some sort and laid it over him; that Bailey then went toward the front of the store and out; that in front of the store was a chair and a bench; that he (Curran) did not know where appellant went when he disappeared through the front of the store, and did not know whether he left the premises or not; that the witness went to sleep and remained asleep until about 3 P. M., when he awoke and found appellant seated in a chair in front of the store, asleep. Further, that a revolver was habitually kept about the store; that it was sometimes kept under the store counter, sometimes in a rice barrel, and sometimes under the pillow of the bed; that when he arrived from the ranch at 1 o'clock he noticed that appellant had the revolver stuffed down into his trousers, as he sat at the table with the trapper; that when he awoke in the afternoon he was still feeling badly; that he took a package of cigarettes over to a man working at a milling establishment near by, came back, and talked with appellant; that something was said about the deceased and also about preparing a meal; that he (the witness) went to the cabin of deceased to call him; that he found the deceased lying in a pool of blood dead, upon the floor of one of the rooms; that he immediately returned to the store, informed appellant of what he had

found, and was instructed by appellant to call some of the
men and notify the officials; that when these arrived, the
party, including the witness and appellant, went over to
the cabin and viewed the dead body, and then returned to the
store; that appellant himself phoned to the sheriff; that the
witness noticed some red marks or spots upon the trousers
and shoes of appellant and called appellant's attention
thereto, whereupon appellant informed him that he had
spilled some catsup over them; that the witness told appellant
that the spots "looked bad," whereupon appellant took off
the trousers and washed his shoes. Other details given by the
witness we do not regard as in any way presenting incrimi-
nating matter. An officer who visited the store asked whether
any weapons were kept about there and was told by Curran
that there were weapons, including a revolver; he asked that
the revolver be given him, and Curran went to the bed and
took the revolver from under the pillow; it was a 38-caliber
revolver, fully loaded, except that one chamber had been
discharged; there was about the weapon an appearance and
smell as though the revolver had been discharged, as the
witness said, within a few hours previous. No attempt was
made by appellant to destroy or conceal the trousers, and
portions of them were later taken for the purpose of having
the spots analyzed. One witness, who was engaged in a
laboratory in Los Angeles, testified that he had analyzed the
coloring matter obtained from some of the spots and that he
had determined that it was human blood. At no time did
appellant make any statements which tended of themselves to
incriminate him. Some little contradiction was shown be-
tween statements made at the trial, regarding the time when
the shot had been fired from the chamber of the revolver, and
statements made previously. It was shown that appellant
had previously stated that the gun had been fired about
a month before the alleged homicide, and his statements at
the trial showed that it had been fired about a week before.
Appellant and the deceased had always been close friends.
Appellant testified that deceased had done some favors for
him and that he had done many favors for the deceased. The
only hint of any quarrel was that relating to an argument
which occurred between the two men at a time considerably
in advance of the commission of the alleged crime, which
argument arose over the refusal of deceased to pay fare to an

automobile driver who had brought the two men home from some point. At that time the deceased was objecting to the amount of the fare, and appellant insisted that he should not argue with the driver, but pay it. The fare was paid and the dispute there ended, and from no testimony does it appear that the men were other than upon the most amicable terms thereafter, as they had theretofore been. It was established that deceased was killed by a bullet passing through his head, and a bullet, which was picked up in the room near the body, was of 38-caliber.

We have now stated all of the most material evidence offered in the case by which the prosecution claimed that the guilt of appellant was established. The question, then, submitted to us is as to whether this evidence was of such a substantial nature as to justify the conviction, or whether it merely presents a set of suspicious circumstances the sum of which cannot amount to proof of the commission of the alleged crime by appellant. We are not satisfied that the proof made was sufficient to support the verdict of the jury. In expressing this conclusion we have not left out of view the requirement that before an appellate court can interfere with the verdict of a jury made upon conflicting testimony, the evidence shown must be of such an unsubstantial nature as to amount to no proof at all; and thus do we characterize the evidence for the prosecution, as shown in this record. The evidence was circumstantial purely, and at best established only a suspicion of guilt; the alleged incriminating circumstances stood alone and formed no completed chain. No witness produced at the trial saw appellant go to the house of deceased on the afternoon referred to, no one saw him at that house, and no one saw him on that day discharge a revolver. Absolutely no motive for the crime was established, and the fact of the conceded friendship between the deceased and appellant is a potent argument against any subtle motive having been aroused in the mind of appellant. The statement of the medical expert that the blood that he found upon the trousers was human blood did not have any direct effect to connect appellant with the alleged murder; and this witness declined to state whether the blood that he examined was fresh or old. The opinion of the officer who examined the revolver, to the effect that he believed from the smell and appearance that the chamber had been discharged within a few hours prior

to the making of his examination, while also a suspicious circumstance, could not legally be given much weight, unsupported by some proof other than that narrated, such, for instance, as establishing what the prosecution did not establish, that appellant, between the time that deceased returned to his cabin and the time of the discovery of his dead body, had visited the latter's place of abode. It is understood, of course, that in considering the particular question under discussion the evidence for the prosecution must be taken alone and given the strongest interpretation permissible. It may be added, however, that as to each of the matters adverted to, the appellant testified freely and offered plausible explanation. As to the firing of the gun, he stated that at the time he was first interrogated about it he did not recall precisely the time that he had fired the gun, but that some days after that time a witness (apparently reputable) had reminded him that about a week before that time he had, in the witness' presence, discharged the gun at a stray dog near the store. He produced this witness, who corroborated the testimony fully. As to the alleged blood spots, he testified that on the day of the alleged homicide he was intoxicated and that in taking catsup from a bottle he had spilled the contents down the front of his trousers and on to his shoes, and remembered that Curran had called his attention to it and that at that time he had taken off the trousers and washed one of his shoes to clear it of the stains. He further stated that a day or so before, while wearing the same trousers, he had killed some squabs with a butcher-knife and that, no doubt, blood had dropped upon the trouser legs from the birds; that he knew of no other blood having gotten there, although he said he was in the habit of shooting rabbits and of wearing the trousers while so engaged. He testified further that he was lying down when Curran returned that afternoon, and that he did not get up until later in the day. He flatly contradicted Curran as to the latter having gone to sleep, and stated that he saw Curran behind the counter after the latter arrived from the ranch and saw him there again when he woke up. Another witness, apparently reputable, testified that he saw Curran back of the counter at about 1 o'clock and again at 3. Appellant stated, and there appeared to be no dispute as to that, that it was his habit to keep the revolver about the store on account of thieves, who had previously robbed him; that on

the day in question he did put the revolver in his trousers for a time, but did that because he found it under the counter and was afraid someone would take it, and that he had put it in his pants, intending to put it under the pillow, but was interrupted at the time. He did not state, however, with clearness as to when the gun had been replaced under the pillow. Upon the evidence introduced on behalf of the people, including all of the alleged contradictions, as shown in the statements made by appellant, we do not think that a sufficient case was made entitling the jury to return a verdict of guilty. Having reached that conclusion, it will not be necessary to give particular attention to the alleged errors assigned by appellant. We may call attention, however, to one of them: The defense produced two witnesses who were ready to testify that between 1 and 3 o'clock on the afternoon of December 15th, when they saw Curran back of the counter at appellant's store, that Curran told them that Bailey was asleep. It will be remembered that Curran's testimony was that he himself went to bed and that he did not know what happened after that until just before the time the body of deceased was discovered in the cabin. That this testimony was most material, there can be no doubt; that it was admissible as part of the *res gestae* we do not believe. It was purely impeaching testimony and no foundation had been laid for its introduction in the examination of Curran. We called attention to the fact that Curran had disappeared at the time of the second trial and could not be found; hence his testimony, given at the previous trial, was read in evidence. He was not at that time asked as to whether he had made the statement to these witnesses to the effect that on that afternoon appellant was asleep. It might well be that the defense, as counsel state, was laboring under a disadvantage because he did not know that there were witnesses available at the first trial who would testify to these facts. But that was a misfortune which could not be made to supply the want of sufficient foundation being laid for the introduction of the testimony referred to.

For the lack of sufficient evidence shown to justify the verdict of the jury, the judgment appealed from is reversed.

Conrey, P. J., and Myers, J., *pro tem.*, concurred.