[Crim. No. 709.   Third Appellate District.—January 22, 1924.]

## THE PEOPLE, Respondent, v. LAWRENCE MAHACH et al., Appellants.

[1] CRIMINAL LAW—APPEAL—REVIEW OF EVIDENCE—MISCARRIAGE OF JUSTICE.—Granting that the question of the sufficiency of the evidence cannot, in a criminal case, be reviewed on an appeal from the judgment, where no motion for a new trial has been made and there is, consequently, no appeal from an order denying a new trial, since the adoption into our constitution of section 4½ of article VI, it is essential, where the correctness of the rulings upon the evidence and the charge of the court is challenged, that all the evidence shall be brought up for review with the appeal from the judgment in order to enable the reviewing court to determine whether the errors so complained of, if errors they be, would result in a miscarriage of justice in the event the judgment be sustained.

[2] ID.—ROBBERY—EVIDENCE—DESCRIPTION OF SURROUNDINGS—TIME. In this prosecution for robbery, the trial court did not commit error in refusing to permit a witness for the defendants to testify that there was a well-defined trail leading from an open space where one of the defendants was first found after the robbery to the place in the thicket where his suitcase was found, where it was not shown or attempted to be shown that conditions at the place and surroundings where the suitcase was found were the same at the time the witness visited the place during the course of the trial as they were when the suitcase was found, some three months or more prior thereto, and the testimony was objected to by the prosecution on that ground.

[3] ID.—ACCUSATIONS OF PERJURY AGAINST DEFENSE WITNESS—ABSENCE OF JURY—KNOWLEDGE—APPEAL—RECORD.—On appeal from a judgment of conviction of robbery, error may not be predicated upon the action of the trial court in stating that there was probable grounds for believing that perjury had been committed by a certain witness for the defense and in ordering said witness into the custody of the sheriff and that his testimony be submitted to the grand jury, where the trial jury was absent when the incident took place and there is no showing, by affidavits or any other appropriate legal mode, that the jurors, or any of them, obtained any knowledge of the incident, either by reading the news items in the local newspapers in regard thereto or otherwise.

3. Commitment or holding of witness for perjury during trial as grounds for reversal, notes, 19 Ann. Cas. 423; 43 L. R. A. (N. S.) 845.

[4] ID. — PREJUDICIAL ERROR — PRESUMPTION.—Since the insertion of section 4½ into article VI of the constitution, prejudice is not presumed from error, but it is incumbent upon the complaining party to make an affirmative showing that prejudice followed from the error relied upon.

[5] ID. — TAMPERING WITH WITNESS — UNJUST ACCUSATION—REBUKE BY COURT.—The charge by the attorney for the defendants that the district attorney's office "tampered with" witnesses is a serious one, as it implies that the tamperer has wrongfully and criminally induced or attempted to induce them to pursue a course as such which is contrary to the fact or the real truth of the matter to be judicially determined, and in the absence of any ground for such a charge by an opposing attorney in a case and in the presence of those who are required to decide the facts, such remarks justify a rebuke of the accuser by the court.

[6] ID. — REMARKS EXCHANGED BETWEEN COURT AND COUNSEL — INSTRUCTIONS TO DISREGARD — APPEAL — PRESUMPTION. — Where the trial court repeatedly, during the progress of a trial, admonishes the jury in very clear and positive language that any remarks exchanged between court and counsel in the discussion of questions *arising at the trial should not be considered by them* in passing upon the question whether the defendants were or were not guilty, but that that issue is to be determined by them solely upon the evidence, considered in the light of the law applicable to the case as given them by the court, the appellate court, on appeal from the judgment of conviction, must assume that the jury heeded such admonition in the deliberations upon the case.

[7] ID.—ALIBI—OPERATION OF STILL—PROPER CROSS-EXAMINATION.—In this prosecution for robbery, one of the defendants, in support of his claim of alibi, having testified that for some time prior to the commission of the robbery he had *maintained a whisky still* about two miles from his home and that prior and subsequent to the commission of the robbery he was at the still day and night, the prosecution, on cross-examination, was entitled to go into the questions as to who conducted it, whether he alone or assisted by others, and the name or names of any party or parties he had obtained the materials from to construct the still, all to the end that it might be determined, if thus it could be, whether, as a matter of fact, defendant was the owner of the still or interested to an extent that would cause him to remain there during the days he was sought by the officers.

[8] ID.—REFUSAL TO ANSWER QUESTIONS—PENALTY THREATENED—ABSENCE OF PREJUDICE.—Said defendant, having refused, on cross-

---

5. Effect of reference by prosecuting attorney in arguments to jury to attempt to tamper with witness as grounds for reversal, note, 30 L. R. A. (N. S.) 795.

examination, to give the name of the person from whom he secured certain portions of his "plant," was not prejudiced by the action of the trial court in threatening to strike out his entire testimony theretofore given if he did not answer the question.

[9] ID.—EVIDENCE—ADMISSION OF WHOLE CONVERSATION OR WRITING. Under section 1854 of the Code of Civil Procedure, where a part of a conversation or a writing material and relevant to the issues of a case is given in evidence, the other parts of such conversation or writing having relevant reference to the part given may also be introduced; but it was never intended that under the guise of that section there might be lugged into the record of a case a mass of irrelevant and incompetent testimony which might have a tendency to militate seriously against the rights of the party against whom it was admitted.

[10] ID.—AGREEMENT TO SURRENDER—PROPER REDIRECT EXAMINATION. On cross-examination of the deputy sheriff who arrested one of the defendants, defendants' counsel having brought out the fact that said defendant's wife made some kind of an agreement with the sheriff that said defendant was to be at his home and surrender himself, but having left the matter in such manner as possibly to convey the impression to the jury that some sort of pressure or undue influence had been practiced by the officer upon said defendant and his wife to induce the former to surrender in such manner as to make it appear that he had done so under the force of a consciousness of guilt, the prosecution had the right to straighten the matter out by a proper examination of the witness for that purpose; but it should not have been permitted to ask questions which could not throw any light upon the issues of the case and had no relevancy to the subject of the cross-examination and the only effect of which would be to place the accused in a bad light before the jury.

APPEAL from a judgment of the Superior Court of Humboldt County. Charles O. Busick, Judge Presiding. Affirmed.

The facts are stated in the opinion of the court.

T. H. Selvage and Eugene Selvage for Appellants.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, J.—The defendants, who are Indians, and who were, by an information filed in the superior court of Humboldt County, jointly charged with, and, upon their trial,

found guilty by a jury of, the crime of robbery, have brought the case to this court by an appeal from the judgment of conviction. The appeal is supported by a transcript of all the proceedings in the case, including the testimony. The defendants made no motion for a new trial. The points upon which reliance is placed for a reversal of the judgment are that the evidence is insufficient to support the verdict and judgment and that the court, in rulings involving questions of the admissibility of certain testimony, committed errors, the effect of which was to deny to the accused a fair and impartial trial.

The attorney-general preliminarily urges the proposition that, the defendants having failed to apply for a new trial, and, therefore, there not being here an appeal from an order refusing a new trial, the question whether the evidence supports the verdict cannot be reviewed, since, so it is contended, such question is reviewable only upon an appeal from such order. It has been held that the question whether the evidence is sufficient to support a verdict in a criminal case is reviewable on appeal from the judgment. (*People* v. *Clayton,* 33 Cal. App. 357 [165 Pac. 37] ; *People* v. *Bailey,* 38 Cal. App. 521 [176 Pac. 880].) [1] But granting that the question of the sufficiency of the evidence cannot, in a criminal case, be reviewed on an appeal from the judgment, where no motion for a new trial has been made, and there is, consequently, no appeal from an order denying a new trial, it is still true that, since the adoption into our constitution of section 4½ of article VI, it is, nevertheless, essential, where the correctness of rulings upon the evidence and the charge of the court is challenged, that all the evidence shall be brought up for review with the appeal from the judgment in order to enable the reviewing court to determine whether the errors so complained of, if errors they be, would result in a miscarriage of justice in the event the judgment be sustained. (*People* v. *Clayton, supra.*) And, in passing upon the points so raised, the appellate court would, in effect, be required to pass upon the question of the sufficiency of the evidence to uphold the verdict.

The record is unusually voluminous. It embraces some twelve hundred pages of evidence, both direct and circumstantial, which, in our investigation of the case, has been carefully read and considered. The defendants testified

and each took the witness-stand and positively denied having
any connection with the commission of the robbery or hav-
ing any knowledge as to the identity of the perpetrators
of the crime.   They also contradicted, or attempted to ex-
plain, upon a theory consistent with their innocence, certain
circumstances which, considered with other more direct proof
of their guilt, were and are of an incriminatory character
of more or less potent significance.   Yet, with their denials
and their explanations, the people presented a very strong
case against them.   Indeed, accepting, as it must be assumed
that the jury did, the testimony of the witnesses introduced
by the prosecution as verity, the case made by the people,
in support of the charge stated in the information, is well-
nigh, if, indeed, not entirely, conclusive of the guilt of
the accused.   If, therefore, the record here disclosed no
errors in the rulings of the trial court admitting incom-
petent and irrelevant, or excluding competent and relevant
testimony, or in the charge to the jury, the judgment of
conviction of the accused would stand supported by an im-
pregnable foundation.   There were, however, errors made
by the court below in the trial of the case, and we are now
called upon to examine these assignments by the light of
the evidence presented by the people (for it is not the office
of this court to determine evidentiary conflicts) and to say
whether, after such examination, they involve errors of so
egregious a nature from a legal point of view as to compel
the conclusion that a miscarriage of justice would attend
and follow an affirmance of the judgment.   Much of the
evidence is of multifarious circumstances.   Hence, a detailed
statement thereof cannot be presented herein.   It is con-
ceived to be sufficient, therefore, to state the facts in a gen-
eral way.

The robbery charged in the information occurred in the
town of Fortuna, Humboldt County, on Wednesday, the
third day of May, 1922, near the hour of 11 o'clock A. M.
It appears that, on the day just mentioned, two masked
men entered the Bank of Fortuna situated in said town and,
holding revolvers in their hands, and after closing the
front door of the bank, ordered the parties then in charge
of the bank to deliver to them "your money."   The bandits
not only had white handkerchiefs over their faces, but also
had their foreheads and the back of their necks covered with

talcum powder and rouge. They also wore gloves. One of the bandits jumped over the counter, through the cashier's window, and, with a revolver in one hand, proceeded to deposit all the currency in sight and other moneys which were in the vault, which, on his command, was opened by one of the officers of the bank, into a white sack a couple of feet in length. This sack the bandit took from some part of his clothing after he got behind the counter. The coin taken by the robbers was in a Federal Reserve bank sack and this sack with the coin was placed in the larger sack. While he was thus engaged, the other robber held at bay with a revolver two customers or visitors in the bank, commanding them to make no move. After securing all the money in sight or shown to them by the officers of the institution, the robber who operated back of the bank counter backed out of the door into the lobby of the bank, thence, still backing, went out of the building and carried the money in the sack to an Oldsmobile car which was parked in front of and next to the sidewalk of the bank building, and threw the sack into the front part of the car next to the driver's seat. While this was going on the other robber held his revolver upon the people who were in the bank until the man with the sack had safely deposited it in the car, and he thereupon followed his confederate and jumped into the back part of the car. The car was then started by the man who carried the money away in the sack and proceeded at a rapid rate of speed "around the corner" of the street near which the bank was situated and proceeded in a northerly direction from Fortuna. The sum of approximately nineteen thousand dollars was taken by the robbers. Of this amount, a sum a trifle in excess of three thousand dollars was in gold and silver—the bulk thereof being in gold—and the balance in currency. Immediately following the departure of the robbers in an automobile from the bank building, the parties in the bank at the time of the commission of the crime rushed to the street and raised "a hue and cry" and so notified the people then about the streets of the robbery. The fact that the crime had been committed immediately became known to substantially all the people of the town. The sheriff's office at Eureka, a distance of thirty or thirty-five miles from Fortuna, was at once apprised of the robbery by telephone,

and, at the same time, a posse of Fortuna citizens, under the leadership of the local peace officers, was being organized, and within less than half an hour after the robbery the posse, consisting of some thirty or more people, was on its way in pursuit of the criminals, said posse going in automobiles in a southeasterly direction and toward the village of Carlotta, situated a distance of some eight or nine miles from Fortuna. Reaching a point about two miles from Carlotta, the posse discovered on the roadside the car—an Oldsmobile touring car—in which the bandits were seen to leave the bank building. When so found, the car was without an occupant, and no one in sight was near it.

At this juncture, it is appropriate to explain the theory of the district attorney in the prosecution of the case in the court below with respect to the Oldsmobile referred to and which theory seems to be well supported by the record. The evidence, without conflict, shows that, on the evening of the twenty-ninth day of April, 1922, one O. J. Pidgeon, a citizen of Eureka, drove his Oldsmobile to and parked it in front of the Elks Building in said city, and thereupon went to the Elks' lodgeroom to attend a session of the local organization of that order and also a banquet to be given in said hall upon the adjournment of the session. When Pidgeon returned to the sidewalk, near the hour of 11 P. M., his car was missing, and he did not recover it until the following Thursday, which was the day immediately succeeding that upon which the robbery of the bank occurred. The Oldsmobile above referred to as the one in which the robbers left the bank with the money they had taken from that institution and later found deserted on the highway near Carlotta was the car which was stolen from Pidgeon in Eureka on the night or evening of April 29, 1922. The hypothesis upon which the people proceeded in the presentation of the case against the defendants in the trial court was that the parties who committed the bank robbery had stolen and taken the Pidgeon car on the night of the twenty-ninth day of April from where it was parked in front of the Elks Building, in the city of Eureka, and used it to facilitate the commission of the crime and "a get-away" upon the success of their scheme to rob the bank. The importance of the testimony presented in support of this theory will presently more clearly be made to appear.

The country in the neighborhood of Carlotta is mountainous and covered with heavy growths of brush, wild bushes, and trees. Running through that country are several streams of water. Among these are Yager Creek and the Van Duzen River. The first named is the nearest of the two to the village of Carlotta and the point on the highway at which the Oldsmobile was found. The posse of Fortuna citizens had started from where the Oldsmobile was left by the bandits and proceeded in a search for the fugitives before the officers connected with the sheriff's and district attorney's offices arrived on the scene. They observed footprints of two different persons leading from the highway near where the bandits left the car into the woods and these tracks they followed to a point between Yager Creek and the highway. At said point they observed that the footprints or tracks of one of the parties pointed in the opposite direction from that in which it clearly appeared the two individuals had traveled together to the point referred to. One of the men in pursuit of the criminals —Emerson by name—followed a trail to some brush which he found had been broken through, and passing through the brush came to an open space, formed by the brush and other timbers, in the shape of a horseshoe, and there he discovered the defendant Mahach lying on the grass. This "open space" immediately borders on Yager Creek. Mahach was ordered by Emerson to rise to his feet and throw up his hands. He obeyed the command but asked Emerson "What is the matter with you?" to which Emerson replied that the bank at Fortuna had been robbed and that the robbers were believed to be in hiding in that vicinity. Mahach then proceeded to explain that he had been the night before at a place called Wildwood (a distance of a few miles from Carlotta) and had there engaged in gambling and drinking liquor; that he became intoxicated and left Wildwood at a late hour of the night and unconsciously wandered in the direction of Carlotta; that he did not realize where he was until the dawn of day, when he recognized certain landmarks with which he was familiar, he having at one time been employed for several months at the Holmes lumber camp, which was situated only a few miles from Carlotta; that, being tired from the want of sleep and feeling sick, the effect of his excessive drinking the night before, he

went into the brush and to the spot where he was found
to lie down and sleep. He told Emerson that, in his
wanderings during the night, he had lost his suitcase.
Emerson, not supposing that he was one of the bandits,
said to Mahach that he had better leave that locality im-
mediately, as the officers and other citizens were searching
the woods thereabouts for the men who committed the
crime and that he (Mahach) might be shot and injured by
some one of the searchers; that he (Emerson) had only
a few minutes before heard some shots. Mahach replied
that he hoped they would capture the robbers, for then, so
he declared, he would not be suspected of having been
implicated in the robbery. Mahach thereupon left the place
where he was found and went to Holmes camp. Shortly
after Mahach departed from the woods on his way to Holmes
camp one of the posse, G. H. Hudson, who was with Emerson
for a short time, found a suitcase in some brush—a sort of
thicket—a couple of hundred feet from the spot where
Mahach was lying when found. It should here be stated
that Mahach, when discovered, was attired in an overseas
uniform, he having been a soldier in the late war. On opening
the suitcase an old suit of clothes, a brown cap, a pair of old
tan shoes, and seven or eight 38-caliber cartridges were found
therein. The suitcase also contained a box of talcum powder
and some rouge. There was a sprinkle of talcum powder
on the coat found in the suitcase and also on the outside
of the suitcase, as well as on the ground near where Mahach
was lying. On examining the shoes, they were found to be
damp and in one of them there was a fresh green leaf from
a tree or bush. It was also noticed that at the time he
was found by Emerson Mahach's face appeared to have
been recently washed and that there were indications near
the edge of Yager Creek near where he was found that he
had washed his face in the water of said creek. Emerson
and other witnesses testified that Mahach had talcum powder
on the back of his neck and behind his ears. They also
testified that the clothing, leggings and shoes he had on when
found did not have any mud, dust, or other marks indicat-
ing that he had walked any considerable distance. All these
circumstances were revealed to the sheriff upon his arrival
and also he had been informed of the fact that the men
who committed the robbery had their necks and faces covered

with talcum powder and rouge and therefrom he formed the belief that Mahach was one of the bandits who committed the crime. He, accompanied by one of his deputies, thereupon immediately went to Holmes camp and there placed Mahach under arrest and returned with him to the place where the automobile had been abandoned on the highway. The suitcase found, as explained, was shown to Mahach on his return with the sheriff and he admitted that it belonged to him. Mahach was thereafter taken to the bank where a mask and a cap were placed upon him and he required to walk back and forth in the bank in the presence of the bank officials and others who were present at the time the robbery took place. He was then taken by the officers in an automobile to Eureka. The witnesses in the bank at the time of the robbery testified that as thus exhibited to them his appearance and manner of walking were the same as those of the robber on the outside of the counter when the crime was committed. During the course of the trip to Eureka Mahach did not deny having been connected with the robbery nor did he admit that he was one of the robbers. He remarked, though, that it was just as well that he should go to prison, as there was no chance for him to secure work by which he could make a living. He further stated, in effect, that the bankers had said that he would get a long term for the robbery. As a matter of fact, Mahach, in his conversations with the officers and before he pleaded to the information, never did at any time make a specific denial that he was one of the two parties that committed the robbery.

On the 7th of May, J. H. McCallum, who, with others, spent several days in searching the woods near Carlotta for the bandits, discovered the coin (amounting to over $3,000) in a Federal Reserve bank sack cached in a wood-rat's nest, about two hundred feet from where the Oldsmobile was found. The currency was not and had not, up to the time of the trial, been found.

About the time Mahach was discovered by Emerson there were, as stated by the latter to the former, several pistol shots heard. It appears that a member of the posse, Bert Robinson, followed the footprints of the two persons and came to a certain point in a thicket and heard a noise as if some person or persons had "jumped up," as the witness

described the noise, and he proceeded in the direction from which the noise came. In the meantime he met a Mr. Stewart, the owner of the land near where the pursuit was being prosecuted, and he (Robinson) said to Stewart that he was going into the brush and if he (Stewart) should see anyone to whistle or give some alarm to attract him. Robinson had not proceeded far when Stewart whistled and the former came out of the brush in time to see a man running toward Yager Creek with his shoes and a sack in his hands. He yelled at the man and commanded him to halt. The man hesitated a moment and then started to run when Robinson shot at him two or three times. Robinson saw the bare footprints of a man going in the direction in which he saw the fleeing individual and he (Robinson) followed. The man was within his sight for a considerable distance. Robinson saw him running down the bank of Yager Creek and passing under the cliff for a considerable distance when he left the creek and started toward the Van Duzen River, Robinson in pursuit. Finally the latter lost sight of the man, but proceeded to said river where there was a canoe moored to the bank. To this point the bare footprints of the man were plainly discernible; but it seems from there on the footprints were made by shoes, the theory being that he put his shoes on at that point. The man proceeded on until he reached a point of several hundred yards from where Robinson was and then forded the river, holding the sack in his hand and passed on up a hill into the woods and there all further trace of him was lost.

The fact that Mahach and the defendant Rube were and had been constant companions ever since the former returned from the war was generally known in and about Eureka, Pepperwood, Scotia, Wildwood, Rio Dell, and other small towns in Humboldt County. The fact was known to the sheriff's office, and after the arrest of Mahach upon circumstances which have been detailed and which were extremely suspicious, it occurred to the sheriff and the other officers that the robbers were the defendants. The suspicion that such was the truth was strengthened by the fact that the parties who saw the fleeing man at whom the shots were fired described him as being of dark complexion and corresponding in build and stature with those physical characteristics of Rube. Rube resided with his family in Pepperwood and

65 Cal. App.—24

from the evening of the 3d until the evening of the 11th of May his residence was constantly watched and guarded day and night by the officers. Mrs. Rube was informed by one of the officers that her husband was suspected of being one of the parties who robbed the bank and finally negotiations were entered into between her and the sheriff's office looking to the consummation of an arrangement whereby she would induce her husband to surrender. On the evening of the 11th of May he appeared at his home and immediately thereafter Deputy Sheriff John Long went to his residence and placed him under arrest. Rube was shortly thereafter taken to Eureka and placed in the county jail. When Rube entered the county jail the first question he asked was whether the other bank robber was there. At no time did he deny being connected with the commission of the crime. When asked questions by the officers tending to elicit from him some information concerning the crime, Rube stated that he did not care to discuss the matter. He did, however, in substance, say to the officers that while they and the citizens were searching for him some of them came so near where he was in hiding that he could have shot some of them if he had had a pistol. It also appeared that the sheriff or one of his deputies stated to him that if the missing money was restored to the bank by him, his wife would receive the reward or a certain per centum on the amount of the money. Rube replied to the officer making this proposition by asking him: "How do you know that I took or have the money," or words to that effect.

We will next consider certain circumstances happening a few days before the day of the robbery, as well as those leading up to the time of the robbery on the third day of May. As has been shown, the Oldsmobile found on the highway near Carlotta was the property of the Mr. Pidegon above referred to, it having been taken by someone from in front of the Elks' Building in Eureka on the night of the 29th of April. The evidence shows, and, indeed, the defendants admitted the fact, that the latter were in the city of Eureka on the twenty-ninth day of April. In this connection it should be said that, as before stated, Mahach and Rube were and had been for a long period of time constant companions. They traveled together from place to place in Humboldt and Del Norte Counties, ostensibly in

search of work. It was also shown that on the twenty-fifth
day of April, 1922, one Ray Purcell sold to the defendant
Mahach at Eureka a 38-caliber revolver. It was further
shown that a few days thereafter, and before the day of the
robbery, Mahach and Rube were in Crescent City, Del Norte
County, and occupied together a room in the Travelers
Hotel at said place and that an officer, having occasion to
visit the room, saw Mahach in the possession of a 38-caliber
revolver. The evidence shows that on the morning of the
30th of April, which was Sunday, parties bent on fishing
and picknicking, when passing through the woods about two
miles from Pepperwood, saw an Oldsmobile, closely resem-
bling the one in question, parked behind a large redwood
tree about two or three hundred yards from the highway.
At the time the Oldsmobile was thus seen there was no one
in or about it. Later in the afternoon some of these same
parties repassed the spot where the car had been seen and
it was then not there. Several witnesses testified to having
seen the Oldsmobile found on the highway near Carlotta,
or one closely resembling it, being driven around a block
in Pepperwood in the neighborhood of 9 o'clock on the
morning of May 3d, the day of the robbery. A number of
other witnesses—men employed on the highway between
Pepperwood and Carlotta—saw an Oldsmobile between the
hours of 9 and 10 o'clock on the morning of May 3d,
being driven at a rapid rate of speed from the direction of
Pepperwood and going in the direction of Fortuna. Neither
at Pepperwood nor along the highway were the parties who
saw the machine able to tell who was driving it. The cur-
tains on the machine were drawn or down and if anyone
was sitting in the rear seat he could not be seen by reason
of that fact.

Irwin Traverse, a student at the Fortuna high school,
testified that at about 11:20 A. M. on Wednesday, the third
day of May, he had been sent by the principal of the school
to the Fortuna Bank to have a dollar changed into pennies
"for the purposes of the school cafeteria"; that as he was
approaching the bank he observed an Oldsmobile of a deep
brown color parked in front thereof; that the curtains
on the car were down so that the car was inclosed; he pro-
ceeded on and when he reached the sidewalk and was about
six feet from the door of the bank he saw a man with a mask

and talcum powder and rouge on his face, wearing a brown jumper, emerge from the bank and carrying a sack; that the man left the bank hurriedly and went to the front of the automobile and threw the sack "over in the seat where the second person in front would sit"; that the man then jumped into the car and drove away at a rapid rate of speed. He stated that he thought that there was at least one man in the car besides Rube at the time that he saw the latter throw the sack into the car. This witness positively and unqualifiedly identified the defendant Rube as the person who left the bank with the sack and placed it in the car.

Charles H. Haight, a merchant of Fortuna, testified that he was in the bank at the time that the bandits entered it and committed the robbery. He testified that after one of the men had jumped over the counter, secured the money and was in the act of leaving, his mask "dropped down as he passed by me" and thus he was enabled to and did recognize him. He positively testified that Rube was the man who had the sack. He also testified with equal positiveness that Mahach was the other bandit. This witness gave a full description of the circumstances under which the robbery was executed and of the actions of the bandits in executing it. These circumstances are related above. He and other witnesses in the bank at the time testified that the robber on the outside of the counter said to the bandit on the inside, "Make it snappy." The witness Thompson, one of the parties in the bank at the time of the robbery, testified that he had often heard Mahach talk and one of his favorite expressions was, "Make it snappy."

Either on the 28th or 29th of April Mrs. Rube went to a store in Pepperwood, and asked for talcum powder and some rouge. A Mrs. Holmes, who was in charge of the store at the time, stated that she had just received an invoice of "Armours" talcum powder, but that the price mark had not yet been placed upon the boxes. Mrs. Rube bought the powder and rouge. Mrs. Holmes was shown the box of powder taken from the suitcase of Mahach and declared that it was of the same make that she sold to Mrs. Rube. The witness examined the box and was unable to find any price mark thereon.

The parties who were in the bank at the time of the robbery, when testifying at the trial, were shown the cap and coat taken from Mahach's suitcase and testified that they were exactly like the cap and coat worn by one of the robbers at the time of the commission of the crime. All the parties in the bank when the robbery occurred testified that the defendants, as to size, build, complexion, color of hair and eyes, answered the description of the bandits. Some of the same parties testified that the pistols used by the robbers had the appearance of being 38-caliber weapons.

Bert Robinson and other persons who were at the spot where Mahach was found testified that the place where he was lying when found did not show any indication of having been used or lain upon for any considerable time. In fact, Robinson testified that the grass did not show that it had been used "as a bed" at all. He also testified, as did other witnesses, that Mahach showed no signs of intoxication or of having been intoxicated and that there was not discerned any odor of liquor from his breath.

There were many other circumstances of a less incriminating nature than those recited above to which attention need not herein be given. The above is a sufficient statement of the facts presented by the people for the purposes of this decision.

The defendants on the witness-stand denied being in Fortuna on the 3d of May and of being implicated in the robbery. As to the incident of the stealing of Pidgeon's Oldsmobile, as above explained, Rube declared that, while it was true that he was in Eureka on the night of the 29th of April, 1922, and went to his home in Pepperwood, a distance of twenty-five or thirty miles from Eureka, that night, he was taken about two miles from there by a friend of his by the name of Burcham. Rube also explained his absence from his home for the period beginning with the third and ending on the eleventh day of May, by testifying that he was at an illicit still which he was maintaining in the woods a short distance from Pepperwood. It was at this point that Burcham left him, he testified. He further testified that he went to his home on Monday night, the 8th of May, and remained there overnight, returning to the still the next morning. He also testified that his wife on the night of the

8th of May told him that the officers had been there and were guarding the house, as they suspected him of being one of the parties who robbed the bank. The man Burcham, referred to, corroborated Rube's testimony that he (Burcham) took Rube to Pepperwood, or a point near that place, from Eureka on the night of the 29th of April in an automobile which he had borrowed from a friend by the name of E. L. Hartwell. Mahach's testimony consisted of a denial of any connection with the robbery and an explanation, which it has herein hitherto been shown that he gave to Bert Robinson and others, of his presence near Carlotta on the day of the robbery. Mahach also testified that he was and had been for a long time accustomed to using talcum powder on his face and neck.

A witness by the name of McCovvey testified that Mahach and Rube visited him at his place on the Klamath River on the twenty-eighth day of April, 1922, and that Rube left his place on the following day and Mahach on the 30th of April; that Mahach by mistake left a 38-caliber Smith & Wesson revolver at his (witness') place. McCovvey testified that, although not subpoenaed as a witness in the case, he went to Eureka during the course of the trial and took the pistol with him; that he had never before the trial told anyone that he had the pistol; that he met Mrs. Rube in Eureka on his arrival there and that, upon her suggestion, he, accompanied by her, called at the office of the attorneys for the defendants and told them of the pistol and how he came into possession of it. The pistol was introduced in evidence in connection with the testimony of the witness. He admitted that he was a particular friend of Mahach and was personally interested in his case.

Having now presented herein what is believed to be a fair and sufficiently full recital of the facts and circumstances developed by the people in support of the charge set forth in the information, and also a general, yet a sufficient, statement of the testimony introduced by the defendants to show the nature of their defense, it will be next in order to consider such of the assignments of error as it is conceived call for special notice herein for the purpose of determining the question whether any such errors were, in their effect upon the rights of the accused, so grievous or damaging as to forbid the conclusion that, in view of the

entire record, a miscarriage of justice would not follow
from an approval of the judgment. There are many of
these assignments. Some of the rulings complained of,
however, do not involve error. There are others which,
while not strictly correct, resulted only in the bringing into
the record and before the jury matters of such little im-
portance that of them it can justly be said, when viewing
them by the light of the evidence, that they could not have
exerted any influence in bringing about the result arrived
at below. There are then a few assignments which are
more serious.

[2] The first assignment involves the ruling of the court
refusing to allow a certain witness for the defendant to
testify as to an alleged well-defined trail leading from the
open space where Mahach was first found after the robbery
to the place in the thicket where his suitcase was found.
The witness referred to, at the request of the defendants,
went to the places mentioned during the progress of the
trial—three months or more after the day of the robbery
—to view the situation there and ascertain whether there
was such a trail as we have just referred to. The object of
the testimony was, manifestly, to show that Mahach did
not designedly leave the suitcase in the thick growth of
brush in which it was found for the purpose of hiding or
concealing it so that pursuers of the bandits would probably
not come across it; that there was an open, well-marked
trail to the spot which was readily noticeable by anyone
at the place where Mahach was found. The objection to the
testimony was that it was not shown or attempted to be
shown that conditions at the place and surroundings where
the suitcase was found were the same at the time that the
witness visited the place during the course of the trial as
they were when it was found. The ruling sustaining the
people's objection to the proposed testimony on the ground
stated was proper.

[3] After the witness Burcham had completed the giving
of his testimony, and while the trial was still in progress,
the court, the jury then being absent from the courtroom,
stated that there were "probable grounds for believing
that perjury has been committed by this witness" (refer-
ring to Burcham), and thereupon ordered Burcham into
the custody of the sheriff and recommended or advised

that the question whether his testimony, or certain portions thereof, was or were perjurious be submitted to the grand jury of the county. Counsel for the defendants in their brief state that the incident was given publicity through the columns of the local newspapers, and insist that the action of the court in that particular worked great prejudice to the rights of the accused. There is no showing here that the incident was referred to in the newspapers of the city of Eureka, but if we assume, as well we may, that the said papers made a news item, even under sensational headlines, out of the circumstance, still the assignment can be of no purpose to defendants, since there is no showing, by affidavits or any other appropriate legal mode, that the jurors, or any of them, obtained any knowledge of the incident, either by reading the item in regard thereto or otherwise. (*People* v. *Ruef,* 14 Cal. App. 576, 606 [114 Pac. 48, 54].) There is, therefore, no evidence in this record showing or tending to show that the jurors, or any of them, became disqualified to fairly try the case by reason of said incident. **[4]** Since the insertion of section 4½ into article VI of the constitution the rule is not, as formerly, that prejudice is presumed from error, but it is now incumbent upon the complaining party to make an affirmative showing that prejudice followed from the error relied upon. (*People* v. *O'Bryan,* 165 Cal. 55, 65 [130 Pac. 1042]; *People* v. *Stephens,* 29 Cal. App. 616, 621 [157 Pac. 570, 572]; *People* v. *Lapara,* 181 Cal. 66, 67 [183 Pac. 545]; *Vallejo etc. R. R. Co.* v. *Reed Orchard Co.,* 169 Cal. 545, 554 [147 Pac. 238].)

In connection with the complaint that the conduct of the court in directing that Burcham be held for investigation on a charge of perjury was highly prejudicial to the defendants, we may pertinently consider the contention of counsel for the defendants that one of the results of that order of the court was to intimidate other witnesses for the defense to the extent that they were put in fear of giving an honest statement of any facts relevant to and in support of the defense of which they might have knowledge. As in verification of this contention, counsel call attention to the fact that the defendants' witness, Nelson, who resided near Carlotta on the day of the robbery, and saw the officers and certain members of the posse while in pursuit of the bandits, when

asked by one of the attorneys for the defendants the course taken by certain of the posse from his (witness') place on the morning of the robbery, before answering the question stated that he desired some advice as to "the distance from one place to another" in his neighborhood; that he had stated on the witness-stand the day before that it was "five hundred yards from my house up to the road. If it was measured and if there was any less or any more," he proceeded interrogatively, "Do I break the laws of this country by not stating it right?" The court replied to the witness: "You give the best of your information and I say you are not violating any laws of this country." There is nothing in the foregoing to show that the witness was intimidated, nor is there anything in his subsequent testimony or any showing by any other mode that he was intimidated. Moreover, no witness desiring and intending to tell the truth would or could be intimidated into telling an untruth or into a refusal to tell all the pertinent facts he had knowledge of by any act or the conduct of the court. [5] In this connection, however, we may consider another proposition maintained by the defense, to wit: That the attorneys for the defendants brought out the fact by an examination of the witness that the preceding day said witness had been in the district attorney's office and was interviewed, presumably as to his testimony, by a deputy in that office, and thereupon the attorney for the defendants made the remark that, "It is absolutely wrong for the District Attorney's office to tamper with the witnesses," whereupon the court declared: "Mr. Selvage, there is no evidence here that the District Attorney's office has tampered with any witness. Don't make a grandstand play before the jury now. You have no right to make any such remark. If you want to play to the gallery, rent a hall and do it; don't come in here and make such remarks as that in the presence of the jury." There does not appear to have been any justification for the accusation made by the attorney that the district attorney or any of his deputies had "tampered with" any of the witnesses in the case. Such a charge is a serious one, as to say that one has "tampered with" witnesses or jurors in a case implies that the tamperer has wrongfully and criminally induced or attempted to induce them to pursue a course as such which

is contrary to the fact or the real truth of the matter to be judicially determined, and, in the absence of any ground for such a charge by an opposing attorney in a case and in the presence of those who are required to decide the facts, such remarks justify a rebuke of the accuser by the court. At the same time we are constrained to say that some of the language of the court, for obvious reasons, should have been omitted. While it is known that attorneys, in their zeal in espousing and defending the cause and protecting the rights of their clients, will sometimes transcend the limits of forensic propriety and thus exhaust the patience of the judge, the latter should always at least attempt to maintain that attitude of judicial equanimity which would stand in the way of any remarks coming from so high a position which might have the effect of depriving a party to the action of a fair and just trial of the issues. [6] But however this all may be, the record here shows that the court repeatedly, during the progress of the trial, admonished the jury in very clear and positive language that any remarks exchanged between court and counsel in the discussion of questions arising at the trial should not be considered by them in passing upon the question whether the defendants were or were not guilty; that that issue was to be determined by them solely upon the evidence, considered in the light of the law applicable to the case as given them by the court. We must assume that the jury heeded this admonition in their deliberations upon the case.

The defendant Rube, in support of his claim of alibi, voluntarily, or through invitation by his own lawyers, stated that he was, and had been for some time prior to the commission of the robbery charged here, maintaining a whisky still in the woods about two miles from his home, and, as elsewhere herein shown, testified that he was at the still day and night, with the exception of Monday night the 8th of May, from the third to the eleventh day of May, 1922. On cross-examination, and over objections by the defendants, the people were permitted to inquire minutely into the matter of the installation of the still, the ownership thereof, whether in the defendant alone, or in him jointly with some other person or persons, whether anyone assisted him in installing it and as to the names of the parties who made or manufactured the essential equipments

thereof, etc. It was thus developed that the defendant had some barrels and other equipments of the plant made by a plumber in the city of Eureka. Upon being asked the name of the party, the defendant flatly and persistently refused, even when directed to do so by the court, to reveal the name of said party. The district attorney, after futile efforts to elicit information from the defendant as to the name of said party, made a motion that the entire testimony of Rube be stricken from the record. The court declared the conduct of Rube in refusing to answer a pertinent question to be contumacious, but that, since Rube was already confined in jail, an order committing him to jail until he was prepared to answer the question would possess no efficacy or force, and that, therefore, the only course open to the court to force obedience by Rube to the direction that he answer the question would be to grant the motion. The court then stated that the motion to strike would be granted unless the question was answered by the defendant. The latter finally answered the question, stating, however, that he did not know the name of the party but described the place where said party was conducting business in Eureka so that the district attorney was able to identify him. It is contended that the cross-examination was improper and that the court exceeded its authority when it threatened to strike out all of the defendant's testimony theretofore given as a penalty for not answering the question, thus intimidating the witness into returning an answer, and that the conduct of the court in the matter was, therefore, highly prejudicial to the accused. In the main, there was nothing improper in the cross-examination of Rube as to the still. [7] The "plant" was the scene of his alibi, and the people were entitled to go into the questions as to who conducted it, whether he alone or assisted by others, whether he was the owner of it or only employed by others and the name and names of any party or parties he had obtained the materials from to construct the still, all to the end that it might be determined, if thus it could be, whether, as a matter of fact, Rube was the owner of the still or interested to an extent that would cause him to remain there during the days that he was sought by the officers.

[8] As to the means adopted by the court to compel him to name the party from whom he had obtained the bar-

rels, etc., it is sufficient to say that, while we know of no
rule in this state authorizing a court to strike out the testi-
mony already given by a witness as a penalty for refusing to
answer some specific proper question propounded to him, yet
it is perfectly plain that the method adopted by the court to
force an answer to the question could not have injured the
defendants or their case in the slightest degree. Indeed,
Rube's refusal to return a candid answer to the question
would seem to be more damaging in its effect upon the case
of the defendants than the answer itself. He had volun-
tarily admitted that he had been for a long time engaged
in breaking the law in maintaining a whisky still and his
refusal to name the party furnishing him the materials
from which the still was made would be apt to leave the im-
pression with the jury that he was not telling all the truth
regarding the ownership and the establishment of the still.
The answer could not have intensified or added to the gravity
of the crime which he had already admitted having com-
mitted. The only motive that could have prompted him
in refusing to answer the question, and doubtless that
was his purpose in refusing to answer, would seem to be
that thus he hoped to save the party from whom he had
obtained the materials from prosecution in joining with him
in the installation of the machinery necessary to the carry-
ing on of an unlawful or a criminal occupation.

The next and last of the assignments to which attention
will herein be given, and which are regarded as involving
the most serious complaints urged against the court's con-
duct of the case, relate to certain features of the redirect
examination of the witness Long, the deputy sheriff who
arrested Rube, and the cross-examination of Mrs. Rube by
the district attorney. On cross-examination the attorney for
the defense conducting it asked Long, referring to the
circumstance of the arrest of Rube, the following questions,
to which the answers following were made by the witness:

"Q. Marion Rube surrendered voluntarily that night to
you? A. I don't know whether Marion done that or not;
he did not state anything about surrendering voluntarily.
Q. He was right there when you went into the house?
A. He was in the house, yes, sir. Q. Was there not an
agreement made between you and Mrs. Rube before that that
he was to be at the house and surrender himself? A. She

made an agreement in the sheriff's office on Sunday night, May 7th. Mr. Ross (the sheriff), Mr. Hill and myself were present in the office. Q. And she was there in compliance with that agreement? A. She wished to see all parties; she wished to see Mr. Hill (deputy district attorney) herself that evening. Q. Mr. Long, Mr. Rube was at his own house because of an agreement entered into between you and Mrs. Rube? . . . A. Not to my knowledge. Q. Did Mrs. Rube make an agreement with anyone that he would be there at that time and place? A. Well, speaking for myself, not with me."

On redirect examination the district attorney was permitted by the court to examine the witness in detail regarding the terms of said agreement. The district attorney was allowed to ask many questions which had no relevant bearing upon the case; for instance, he asked Long if Mrs. Rube did not say at the time that the alleged agreement was discussed that when "he [Rube] gets a job of work someone will say, there is the man that killed McCardy, then he loses his job." Many other similar questions were propounded in the leading form to the witness, who was required by the court to answer them. Mrs. Rube was subjected to a similar line of cross-examination by the district attorney over the objection of counsel for the defense, many questions being asked which, like the one last above referred to, could not have thrown any light upon the issues of the case and had no relevancy to any agreement which might have been made for the surrender of Rube and their effect could only be to place the accused in a bad light before the jury. The defense objected to the entire redirect examination of Long on the ground that it was not proper redirect examination, inasmuch as the terms or nature of the agreement were or was not shown or attempted to be shown by the cross-examination. They also objected upon the ground that the questions asked of Long on redirect examination and those asked of Mrs. Rube on cross-examination were not pertinent redirect or cross examination. [9] The court allowed the redirect examination and cross-examination referred to upon the theory that it came within the rule enunciated in section 1854 of the Code of Civil Procedure, which reads:

"When part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing, which is necessary to make it understood, may also be given in evidence."

The court by its rulings subjected that section to a misinterpretation of its purpose and scope. What is meant thereby is that where a part of a conversation or a writing material and relevant to the issues of a case is given in evidence, the other parts of such conversation or writing having relevant reference to the part given may also be introduced. If the part not given is explanatory of or in any way qualifies or modifies the part given, then, in such case, the part not given by the witness may be shown. It was certainly never intended that under the guise of said section there may be lugged into the record of a case a mass of irrelevant and incompetent testimony which might have a tendency to militate seriously against the rights of the party against whom it was admitted.

[10] The court made no error when it allowed the people properly to question Long on redirect examination concerning the nature and terms of the agreement. The defense had brought out the fact that there was such an agreement but left it in such manner as possibly to convey the impression to the jury that some sort of pressure or undue influence had been practiced by the officers on Rube and his wife to induce Rube to surrender in such way as to make it appear that he had done so under the force of a consciousness of guilt. The people, therefore, had the right to straighten this matter out by a proper examination of the witness for that purpose. As seen, however, the court permitted the people to go too far.

But, by a careful examination and consideration of all the evidence in the case, we have been irresistibly persuaded to the conviction that, with all the errors of which complaint has justly, from a legal point of view, been made, some trifling and others which, in their nature and their effect, under other circumstances, would be of serious consequence, the evidence of the guilt of the accused is so near, if not

entirely, conclusive, that, in obedience to the command of section 4½ of article VI of the constitution, we are compelled to announce the conclusion that a miscarriage of justice would not and could not result from an affirmance of the judgment. Indeed, it is our unqualified belief, generated from a thorough consideration of the evidence, that of the defense as well as that of the people, that should the judgment be reversed and the accused perchance escape conviction upon a second trial, a positive miscarriage of justice would follow.

We need not essay a *résumé* of the facts and circumstances disclosed by the evidence which seem unerringly to point to the defendants as the perpetrators of the robbery. It seems to us that no fair-minded person, after reading the evidence, even as in conspectus form it is herein produced, could fail to reach the conclusion that the jury by their verdict laid their hands squarely on the shoulders of the guilty parties. We have here a case in which there is not only positive identification of one of the defendants and almost like identification of the other as the robbers, but in which there was shown circumstance after circumstance of the most incriminatory nature that, taken together, alone would be sufficient to support a verdict of guilty. That the robbers were dark-skinned persons is shown, not alone by the positive testimony of eye-witnesses to the commission of the crime, but by the circumstance that the criminals undertook to conceal their identity, in addition to the use of masks for that purpose, by having plastered their foreheads and necks with large quantities of talcum powder and rouge and also the very significant circumstance that they wore gloves, presumably, in their minds, the surest means of concealing the color of their hands and hence the racial class to which they belong. All the circumstances following the enactment of the robbery—Mahach's presence in close proximity to the point in the highway at which the Oldsmobile was abandoned, the finding of talcum powder on his neck, coat, and in his suitcase, and the resemblance of the fleeing bandit in color of face and hair, stature and build, to the defendant Rube, and the circumstance of the known companionship of Mahach and Rube for many months before the robbery, and the many other circumstances which have been above recited—would seem

to lead with direct certainty to the defendants as the authors of the crime. As to the evidence presented in behalf of the defendants and their own testimony, the reading thereof will readily and upon slight reflection convince any person of average intelligence desiring to be fair and just, that, save the express denials by the accused of their guilt, there is no such inconsistency between it and the facts and circumstances brought to light by the people (except, also, the claim of Rube that he was at his still when the robbery occurred) as would have the effect of destroying one circumstance or fact making up the people's case. Rube's story on the witness-stand from the beginning to the end thereof was such as would not bear logical analysis. But, as stated, it is not necessary that there should be an analytical examination of the overwhelming testimony of guilt produced by the people to convince any fair-minded person that the result reached by the jury in this case is as it should be. If, in such a case, section 4½ of article VI of our constitution does not apply, then it would be difficult to imagine a case wherein its application would be legally pertinent.

The judgment as to each of the defendants is affirmed.

Plummer, J., and Finch, P. J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 20, 1924.

All the Justices concurred.