## THOMPSON v. STATE
(No. 1563; Dec. 10, 1929; 283 Pac. 151)

74

For the plaintiff in error there was a brief by *Hagans* and *Murane* of Casper, Wyoming, and oral argument by *Mr. C. D. Murane.*

For the State there was a brief by *W. O. Wilson,* Attorney General, and *Richard J. Jackson,* Assistant Attorney General, and oral argument by *Mr. Jackson.*

*Hagens* and *Murane,* in reply.

BLUME, Chief Justice.

The information in this case charges the defendant with driving an automobile on the evening of January 30, 1927 (a) while in an intoxicated condition, (b) at a speed greater than was reasonable, etc., (c) at a speed so as to endanger the life and limbs of persons using the highway, and (d) without having it under absolute control, in violation of Section 22, Ch. 69, Sess. L. 1921 and Section 3 of Ch. 158, Sess. L. 1925, and that as a result thereof an unknown man was killed. The defendant was convicted by a jury, and from the sentence imposed on him, he appeals. We shall cite the laws applicable in the case. Sec. 3, Ch. 158, supra, provides:

"No person shall operate a motor vehicle on any public highway outside of a city or town at a speed greater than is reasonable and proper having due regard for other traffic and the intended use and condition of the road, nor at a rate of speed such as to endanger the life or limb of any person or animal. A speed in excess of thirty-five miles per hour shall be *prima facie* evidence of failure to operate a motor vehicle at a speed that is reasonable and proper; provided that the speed limits in this section shall not apply to police or any officer of the law when answering emergency calls demanding excessive speed. Every person shall at all times have the motor vehicle operated by him under absolute control."

Section 22, Ch. 69, supra, provides:

"Whoever while in an intoxicated condition operates a motor vehicle, shall be deemed guilty of a misdemeanor."

Section 30, Ch. 69, supra, reads the same as Sec. 8, Ch. 158, supra, and both are as follows:

"The violation of any of the provisions of this Act except when otherwise provided, by any person, shall be deemed a misdemeanor punishable by a fine not exceeding fifty dollars for the first offense, and by a fine of not less than fifty dollars or more than one hundred dollars or imprisonment not exceeding sixty days in the county jail, or by both such fine and imprisonment in the discretion of the court, for each subsequent offense; provided, however, if any person operating a motor vehicle in violation of the provisions of this Act, shall, by result of so doing, seriously maim, injure or disfigure any person or persons, or cause the death of any person or persons, such person shall be guilty of a felony, and upon conviction thereof, shall be fined not less than two hundred dollars, nor more than five hundred dollars, or be imprisoned in the penitentiary for not less than one year and not more than ten years; or such person may be held for a greater offense if the same be ordered by coroner's jury. It shall be the duty of every peace officer to enforce the provisions of this Act."

Douglas and Casper are connected by the Yellowstone highway, which runs, generally, in an easterly and westerly direction, passing through Glenrock, which is about 23.6 miles east of Casper, and through a spot which, by reason of being lower than the surroundings, is called Kimball Draw, and which is about 7.6 miles east of Casper. There are some white railings on both sides of the road at one place of this draw; and near thereto, some 100 feet east thereof, is a bend in the road, the angle of which does not appear, but seems to be somewhat less than 45 degrees, the road turning, say, from an easterly-westerly direction to a somewhat northwesterly one. There is a ditch, apparently about 7 feet wide, that runs along the south side of the road,

and is about 1½ to 2½ feet lower than the latter. The body of the deceased was found on the morning of January 31, 1927, near this bend, but some 15-20 feet away from the road, and about 8 feet south of the ditch just mentioned. Automobile tracks, made by Royal Cord tires, were, at the time mentioned, noticed to have been made recently and to have left the main highway about 150 feet east of where the body lay, traveling with the right wheels apparently on the edge of the road, with the left wheels in the ditch, then crossing a galvanized iron culvert 18 inches in diameter, some 70 feet west from the point where the tracks left the highway, hitting the culvert, and thence following in or along an old wagon track in the ditch above mentioned, and again connecting with the highway some 40-50 feet west of where the body was found, and just east of the white railings along the road. These railings are some 100-125 feet west of the spot where the body was found.

The deceased was found close to a fence post, lying huddled up with the face on the ground. The legs were drawn up under the body. The heels were drawn up next to the buttocks, the deceased resting on the face, knees and the upper part of the body. He had on a sheepskin coat, which was pulled over the head so that the bottom part of the coat came about to the tip of the shoulders. There was lard in his nostrils and a pool of blood as well as some lard, the quantity of which is not disclosed, on the ground. An analysis of his stomach showed "moonshine." There was an abrasion above the left eye, apparently made by gravel or rocks while falling. There were also some abrasions on the chest. There is no testimony whether there were stones or gravel at the place where the deceased was found, or in the ditch or highway, though we may, perhaps, assume that the latter was graveled. The deceased died of internal hemorrhage, the result of a ruptured liver, which, according to Dr. Geis, was caused by a blow against the body, probably from behind, and which might have been made by an automobile, or by falling from a vehicle or from a

train, and in other ways. Death probably ensued within ten to thirty minutes after the injury. There was also a slight bruise on one of the hips. The legs and knees were not injured, though, if struck by the bumpers of an automobile, there would ordinarily, according to Dr. Geis, be an indication of a bruise. The feet of the deceased were frozen, when found, and *rigor mortis* had set in. Dr. Geis examined the body in the afternoon of January 31, and he testified that upon death, the body completely relaxes, *rigor mortis* setting in thereafter, and that from his examination, the deceased probably died before five o'clock of that day, but that he could not tell how much before. Dr. McClellan testified that the deceased probably did not die in the position in which he was found.

Considerable testimony was introduced that the deceased, or some one clothed like him, with a sheepskin coat on, had been walking on the highway on the evening of January 30. The testimony on the point is conflicting and uncertain. One witness testified that he saw him, probably about nine o'clock in the evening, some 300 to 400 yards east of the white railings. According to another witness for the state, the man, assuming that he continued walking at the ordinary rate after he was seen by the witness, would have been in the neighborhood of the white railings, according to another witness a considerable distance east thereof, and according to still another witness, a considerable distance west thereof. According to witnesses for the defendant, too, he would have been a considerable distance west of the railings about the time mentioned.

The defendant left Guernsey in the early afternoon of January 30, arrived at Douglas about 6 o'clock, ate a lunch, and arrived in Glenrock, where he stopped, between 7:30 and 8 o'clock in the evening of that day. He was travelling in a Chrysler car, with Royal Cord tires. An axle of the car had been bent a few days previously, which caused the car to constantly veer to the left, though the defendant did not know that fact on the day mentioned. He had been up

late the night before, and became sleepy at times driving along the road, and went off the road a number of times before arriving in Glenrock. There is considerable testimony in the case that he was intoxicated during that evening, but also considerable testimony to the contrary. He left Glenrock, as he testified, about 8:30 p. m. About a half mile before coming to the white rails he was sleepy, as he stated, woke up, looked at his speedometer and noticed that he was going at the rate of about 30 miles an hour. At the bend of the road something happened, which he later referred to as an apparition or hallucination. He related the incident to the sheriff, who testified in part as follows:

"He said that he was driving along and was very tired and sleepy; he emphasized this and that he hit an object. He said he most likely had been asleep. His first impression was 'My God, I have hit a man', and his second impression was he thought he hit an animal—on second thought; that he had gone farther down the road, and even got out of his car and went back to look and investigate. He decided he hadn't hit a man and came on to town, or started on to town."

Thereafter, not finding that he had hit anything, he drove on toward Casper, and having driven some distance, say from one half to one and one fourth miles, his car stopped. The high tension wire was loose and prevented his car from running. A Mexican came along, attempted to pull his car, and in so doing, ran it across the road and into the ditch on the south side of the road. Thereafter others attempted to pull him out. One of the automobiles backed into his and injured the front of it. His automobile was finally hauled into Casper by a helper from one of the garages in that city. Considerable testimony was introduced in connection with this incident, and others arising out of it; but there is little, if any, discrepancy in the evidence, and none of it seems to have any particular bearing in this case. The defendant finally arrived in Casper

between about 10:30 and 11 o'clock p. m. Still not satisfied that his search at the white railings had been complete, he, about midnight, returned to the place, in company with his friend, Mr. Worthington, and according to the testimony of both, they found nothing that might have been hit by the defendant. There were further statements admitted in evidence against the defendant, additional to those already mentioned. Emanuel Rivas, a Mexican, testified that the defendant, when his car was stalled on the road west of the white railing, was nervous and stated that he hit somebody. The witness Fleming, whose testimony will be further mentioned hereafter, stated that defendant told him that he was nodding as he came to Kimball draw; that he hit or killed somebody in the road; that he had had a couple of drinks of whisky between Glenrock and Guernsey, and that he had offered the witness $1500 if he would get the case dismissed.

An attempt was made by counsel for the defendant to show that the circumstances in the case could be reconciled with the theory that some other person might have run over the deceased. Considerable testimony was adduced in connection with a Ford car with a box on the rear, near the place where the deceased was found. The owner of the car testified that he left Evansville, about four miles west of the white railings, about 9 or 9:30 p. m. of January 30th, to go to his home in Big Muddy, about 8 miles east of the white railings; that he bought some groceries before starting; that he met a car, presumably that of the defendant, when it was on the road west of the white railings; that after driving 500 feet further, he got a flat tire; that he backed the car up and got it on the south side of the road; that his engine was killed and some one helped him push the car on the north side of the road; that he took it to the fence, and left it there for the night, until the next morning; that he stayed at the place for some time, perhaps an hour or an hour and a half, thinking that some one might pick him up, having his lights on part of the time. He fixed

no tire, but simply drained the car. He denied having something over the hood of his car. The witness Patricia Douglas, who was with Mr. Leach, testified that she and Leach left Parkerton, east of the white railings, about 11 o'clock on the night of January 30, going to Casper; that she went back from Casper, leaving about 12 o'clock and arriving home about 1 o'clock; that while travelling west and going past the place where the body of the deceased was found, she saw a Ford car directly opposite on the north side of the road, and about two car lengths away and having something in front or on the hood of the car, which appeared to her to be a sheepskin coat; that when she came back, the car had been pulled near to the fence and further east. Mr. Leach testified that he and Miss Douglas passed the Ford car the first time about 11:30, and that it was then about five feet away from the highway. He said nothing as to a sheepskin coat. Two affidavits filed in support of the motion for a new trial stated that affiants saw the Ford car on and across the highway near the white railings at eleven o'clock of the evening of January 30. Some other items of testimony will be stated later.

■ In Instruction No. 3 the court told the jury that they might find the defendant guilty if the deceased came to his death by reason of one or more of the modes in which the defendant drove his automobile, namely by (a) either operating it while in an intoxicated condition, or (b) at a speed greater than was reasonable and proper having due regard for other traffic, etc., or (c) at a rate of speed such as to endanger the life and limb of persons using the highway at the time and place, or (d) without having it under absolute control. It is insisted that this was error; that the defendant could not be convicted unless all the jurors concurred in one or more of the modes mentioned, and that his conviction was wrong if part of the jurors, for instance, believed that the death resulted by reason of the automobile being driven while defendant was intoxicated, while another portion believed that to have taken place while the car was

not under absolute control; and that in view of the instruction given it cannot be told whether the jurors concurred in one or more of the modes mentioned. And in that connection it is further claimed that the state should have been required to elect on which of the modes charged in the information it sought a conviction. In support of this contention we are cited to Tobin v. State, 31 Wyo. 355, 226 Pac. 681; State v. Washington, 242 Mo. 401, 146 S. W. 1166; State v. Jackson, 242 Mo. 410, 146 S. W. 1166; State v. Brotzer, 245 Mo. 499, 150 S. W. 1078, 1082. In each of these cases the instruction given was held to be erroneous because under it the jury might have found the defendant guilty of two or more separate crimes. But it is not claimed herein that two or more crimes are charged, (a point which we do not accordingly determine; but see thereon State vs. Young, 266 Mo. 723, 731, 183 S. W. 305) and only the manner in which one crime was committed is involved. The cases cited are not, accordingly, in point. It is a well settled rule in criminal pleading that when an offense against a criminal statute may be committed in one or more of several ways, the information may, in a single count, charge its commission in any or all the ways specified in the statute, if not inconsistent, and proof of either of the ways will sustain a conviction. Tobin v. State, supra; 31 C. J. 763-4. And the rule is laid down in 16 C. J. 861, and is supported by most of the cases cited, that "where the same criminal act is involved, the state is not bound to elect on proof of its commission in different manners or by different means." In People v. Petruzzo, 13 Cal. App. 569, 110 Pac. 324, 327, the evidence tended to show that the homicide in question was committed by the defendant as principal or as accessory, and a motion was made to require the state to elect. The motion was denied and this was held to be correct. The court said:

"Under the law the defendant was a principal in either of the contingencies to which we have referred and he could justly be convicted of the charge of murder, although some

of the jurors may have believed that he personally fired the fatal shot, while others were convinced that he was an aider and abettor in the crime. However, if it were necessary to uphold the verdict, we should be guided by the presumption that all the jurors adopted the same theory.''

In People v. Oppenheimer, 156 Cal. 733, 106 Pac. 74, 78, there was evidence of two weapons in a homicide, and testimony of the use of two weapons was objected to as tending to show two different crimes. It was held that the admission of the testimony was not error, the court adding:

''Possibly the defendant, if requesting it, would have been entitled to an instruction that the jury, before they could convict, must all agree upon at least one specific weapon of the two as constituting a 'deadly weapon' with which defendant assaulted Wilson, but no such instruction was requested and we need not definitely decide the point.''

See also Com. v. Brown, 14 Gray 419. It is clear, we think, from the foregoing authorities, that instruction No. 3 was not vulnerable to the objection above stated, although we shall refer to it again later on another point. And we must not be understood as passing upon the question as to whether an instruction in the nature of those mentioned in the California and Massachusetts cases cited should be given on another trial. The point is not before us and has not been argued. We might, however, add that the majority of the court are at present inclined to believe, if the information charges in fact but one crime, that such an instruction should not be given, because the ultimate question is whether or not the deceased came to his death as the proximate result of reckless driving.

■ At the close of the state's testimony the defendant made a motion for a directed verdict, and this motion was renewed at the close of all the testimony. Both motions were overruled and this is assigned as error. It is argued that there is no evidence to show that defendant's automobile or his driving it was the proximate cause of the

death of the deceased, and that hence the *corpus delicti* has not been shown. The *corpus delicti* in this case was the killing of the deceased as the proximate result of a collision with an automobile while it was being driven in an unlawful manner in one of the modes specified in the information. People v. Garcia, (Cal. App.) 281 Pac. 508. But that point need not necessarily be shown by testimony independent of that of the identity of the offender or of his guilt. Richey v. State, 28 Wyo. 117, 131, 201 Pac. 154, 205 Pac. 304; Dalzell v. State, 7 Wyo. 450, 53 Pac. 297. We seem to have a peculiar situation in this case. No one saw an automobile strike the deceased, and the proximate cause of his death and the *corpus delicti* seem to depend primarily upon the question of the identity of the offender, for unless it was the defendant who ran over the deceased, there would seem to be little, if any, evidence that the deceased was run over by an automobile at all, or that the manner in which the latter was driven was the proximate cause of the death of the deceased. The fact that defendant drove his car while intoxicated or in some other unlawful manner would be immaterial herein, unless it is shown that defendant hit the deceased. The question before us should accordingly be considered with that in mind. We think it best, however, not to decide it definitely, but shall discuss some of the salient facts, since that seems to be advisable in view of our decision on other points herein.

Great stress is laid by the state upon the so-called hallucinations and apparitions of the defendant. It must be confessed that upon first blush they are damaging, for impressions of that character are not, ordinarily at least, formed without adequate cause. They are not, however, upon reflection, as damaging as the state seems to contend. Not too much stress must be laid upon the mere words, which at times express thought inadequately. The terms ''hallucination'' and ''apparition'' seem to have been used by the defendant interchangeably, when, of course, they are not synonymous. His statements in that connection varied.

He stated that he "saw" something; that he "imagined" that he saw something; that he "saw an apparition;" that he didn't know whether he "dreamed" that he saw something. At one place he testified: "An apparition, as I understand it, covering all these things, it is something that is sort of visionary * * * I used that expression because it appeared to come to my mind * * * I didn't see it." All in all, his various statements seem to mean merely that, as he stated to the sheriff, he received an impression that he hit something. How did he get that impression? An explanation, in whole or in part, may be found in the state's own theory that the defendant's car made the tracks at the bend of the road, near which the body of the deceased was found. The sheriff's testimony is the clearest on that point. He stated that the car went over, straddled, the culvert at that place; that the left wheels of the car, travelling west, made no track at that particular point—was suspended in the air—and that the car or the wheel "jumped"; further, that the car struck the culvert, which, according to his theory, must have been on the inside of the left wheel or wheels. If that is so, the defendant's impressions that he struck something were made by an adequate cause; they were a reality; and we need not say whether, in view of the state's theory that the defendant was dozing at that place—a fact which he would not positively deny—he should have been aware of the reality rather than to designate whatever happened by the term of hallucination or apparition. But that the defendant struck the culvert in question, let alone his hallucination or apparition arising therefrom, does not prove that he struck the deceased, and, standing by itself, would not show that he had anything to do with the death in question.

The automobile tracks at the bend of the road were a few feet nearer to where the deceased was found than the regularly traveled road, and it seems to be the theory of the state that this fact has a tendency to prove that the defendant, rather than some one else, was instrumental in

the death of the deceased. These tracks, however, were still several feet distant from, and apparently somewhat lower than, the spot where the deceased was found, and there is no evidence to show that if the defendant's car had struck the deceased, the latter would have been thrown that far to the left or that he would have been thrown so as to be in the peculiar position in which he was found the next morning. Furthermore, the testimony, for the state as well as the defendant, shows without any contradiction—though the physical fact may in truth be otherwise—that persons travelling from east to west on the evening of January 30 could, by the light of the automobile, plainly see the spot above mentioned; that a number of cars traveled in that direction after the defendant had gone past the place, but that no human body was seen. Affidavits in support of a motion for a new trial indicate that the spot referred to could also be seen by people traveling in automobiles from west to east, but that the body of the deceased was not seen by affiants traveling in that direction. These facts, particularly in view of the peculiar position in which the deceased was found in the morning of January 31, would seem to indicate that the body was placed at the spot mentioned long after the time that the defendant passed it. That the defendant placed it there while he was waiting in his car and was stalled in the ditch is not likely, in view of the position of the Ford car and the presence of the owner thereof in the immediate vicinity during that time, and if the foregoing testimony is correct, then it would seem that if the defendant had anything to do with the placing of the deceased in the place where the latter was found the next morning, it was during the time that he went back in company with Mr. Worthington, and that would seem to be conjectural, particularly if we may assume—a point on which we are not clear—that no blood would flow from the body, exposed to the cold, several hours after, according to the state's theory, the deceased was killed.

The testimony as to the lard seems, in the absence of explanation, to point to the agency of the death of the deceased closer than anything else. Some lard was found in the nostrils of the deceased, and at the spot where he lay. Who placed it there? The deceased would not be likely to have it with him. The defendant was travelling from Guernsey to Casper to see his wife. He carried no groceries. He would have had lard by the merest accident. None was found in his car, which was taken to Casper by others. None, apparently, was found in the region surrounding the spot in question, which, if found, might have indicated that the defendant or someone else had thrown some lard away. We may, accordingly, assume that the defendant had nothing to do with the lard at least before about midnight. If he had anything to do with it, it was after he returned in company with Mr. Worthington. There is no testimony to that effect. We cannot conjecture why lard would be placed in the nostrils of the deceased, unless it was for the purpose of stopping the flow of blood. To do so three hours after injury would, it seems, have been fruitless. If the defendant accordingly did so, it was done pursuant to a cunning device, and to attribute that to the defendant, of which his companion must have been aware, would, it seems, in the light of the evidence in this case, lead us into the realm of conjecture. If, accordingly, the point as to the lard is of importance in this case, and is left unexplained, the defendant's connection with the death of the deceased would seem to be remote, if not wholly out of the question.

■ The information, as heretofore stated, charged the defendant with driving the automobile at a speed greater than was reasonable and proper, having due regard for other traffic and the intended use of the road. The defendant asked the court to instruct the jury to disregard that portion of the information, as not being supported by any evidence. The court refused to do so. The only testimony in the record on the point, is to the effect that the

defendant was traveling at the rate of thirty miles an hour. Twenty years ago, the courts undoubtedly would have held it to be a question for the jury, as to whether or not a man driving at that rate during the night time was or was not negligent. But we cannot ignore the changed conditions since that time, and cannot require a greater degree of care from the defendant than from the ordinary man. The laws of this state seem to make a dividing line at thirty-five miles an hour, making the driving in excess thereof *prima facie* evidence of negligence. The place in question was out in the country, with only an occasional car passing, according to the record, and without special circumstances being shown which required a lesser speed. We think, therefore, that the request of the defendant should have been complied with, although we do not say that if this were the only error, we should deem it sufficiently prejudicial to require a reversal. The further request, however, for an instruction to direct the jury to disregard the charge in the information that the defendant did not have the car under absolute control, and that he drove it at a rate so as to endanger the life and limb of persons using the highway was, we think, upon the assumption that there was sufficient evidence to submit the case to the jury, properly denied, in view of the testimony as to the defendant's sleepiness.

■ The case made against the defendant, if made at all, was largely by circumstantial evidence. The defendant requested the court to give an instruction on such evidence, and in that instrument embodied the following clause mentioned in Gardner v. State, 27 Wyo. 316, 323, 196 Pac. 750, 751, 15 A. L. R. 1040: "If the circumstances, no matter how strong, can be reasonably reconciled with the theory that some other person may have done the act, then you cannot find the defendant guilty." The court gave an instruction on circumstantial evidence, but failed to refer to the matter mentioned above. It was the theory of the defendant that the opportunity to run over the deceased with

an automobile was as great for some one else as for the defendant. There was testimony in the case, as already pointed out, indicating that the deceased was run over after the defendant had passed the bend in the road; that the owner of the Ford car and perhaps others were for a long time in close proximity to the spot where the deceased was found, and further, the testimony as to the lard seemed to point to some one else rather than the defendant as the person who had run over the deceased. In view of these facts, it was important that the jury's attention should be directed to the specific theory of the defendant, and the refusal to embody the clause mentioned in the instructions given was, we think, in view of the testimony in this case, clearly error.

■ The defendant offered to prove by the witness Burton that he, the defendant, had the reputation as a law abiding citizen. The offer was objected to, and the court excluded the testimony. This is assigned as error. The state contends that only the specific trait, namely, that of being a careful driver, was in question, and cites State v. Villano, (N. J.) 142 Atl. 643. There is an expression in the case which seems to bear out this contention. But the point was not involved in the case. The defendant had, in fact, been permitted to show that his reputation as a law-abiding citizen was good, and the state thereupon had been permitted to show that his reputation for recklessness in driving was bad, and the real point decided in the case was that, if the defendant introduces testimony of general character, the prosecution may rebut that by showing reputation as to the specific trait involved in the case. It is stated in 30 C. J. 169, that in homicide cases it is always competent for accused to introduce evidence showing his general character and reputation for being law abiding. In the case of Harr v. State, 98 Tex. Crim. 1, 263 S. W. 1055, 1058, the court said:

"Appellant offered to prove his general reputation was that of a law-abiding citizen. The state interposed objection to this evidence on the ground that it was immaterial in a case where negligent homicide was the charge being investigated. The learned trial judge sustained the objection on the ground that appellant being charged with driving a car negligently, only his reputation for being a careful and prudent man could be put in evidence. In this respect we think the court was in error. If appellant had been prosecuted directly for driving a car while he was intoxicated or while the car was without lights, there would be little question raised as to his right to show a good reputation as a law abiding citizen."

See. to the same effect, Blashfield, Cyc. of Automobile Law, 3, 2133. We think the testimony as to the reputation of the defendant as a law-abiding citizen should have been admitted in this case, whatever may be the rule in other cases of negligent killing.

■ The witness Frazer was used for the purposes of proving the defendant's good reputation. On cross examination he was asked whether he had not heard that the defendant had run into a boy by the name of Paul Beran with an automobile in the fall of 1925, and that the defendant "was arrested for the alleged offense." The witness stated that he had heard of the incident, but had not heard that the defendant had been arrested. The witness Burton, used by the defendant for proving the defendant's good reputation, also was asked whether he had not heard of the incident, and the witness answered in the affirmative. He was then asked by counsel for the defendant whether he knew what the facts were. This was objected to as incompetent and immaterial and the objection was sustained. Thereafter the defendant was asked to explain the incident. After objection by the state, which was sustained, the defendant offered to prove that the boy had suddenly thrown himself in front of a very slowly moving car, though it was swerved to the right so as to miss him; that his foot was run over by one of the wheels, but that de-

fendant was in no way to blame, and that he was fully exonerated by persons who were near. This offer was excluded, and error is predicated thereon.

Most of the courts hold, that in order to test the knowledge of the witness as to the reputation testified to, he may be asked on cross examination, in good faith, as to whether or not he has not heard of specific acts of misconduct which may have a bearing in the case. The courts are not altogether uniform in so holding. Underhill, Criminal Evidence (3rd Ed.) Sec. 141; Wigmore on Evidence (2nd Ed.) Sec. 988, where the cases are collected. The trouble, of course, is that such cross examination does more than merely test the knowledge of the witness. The fact that he states that he has heard of certain specific acts, nay, at times the very question itself, gives the impression to the jury that they are true. In this case the act concerning which the witnesses were asked was referred to by the county attorney as "misconduct"; it was an act similar to the one for which the defendant was on trial, an act which the prosecuting attorney wanted the jury to believe was misconduct of the same kind with which defendant stood charged. To leave it wholly unexplained would be apt to leave the impression that the latter was a "hit and run driver," just, as is claimed, the prosecuting attorney stated in his argument to the jury. To leave the situation thus, is, of course, wholly unfair to defendant on trial, particularly in a case, like that at bar, where the evidence is mostly circumstantial, and in which the testimony mentioned may well have been influential in finding the defendant guilty. Wigmore, supra, Sec. 988, speaking of such evidence, says:

"But the serious objection to them (inquiries of this kind) is that practically the above distinction—between rumors of such conduct, as affecting reputation, and the fact of it as violating the rule against particular facts— cannot be maintained before the jury. The rumor of the misconduct, when admitted, goes far, in spite of all theory and of the judge's charge, towards fixing the misconduct as a fact upon the other person, and thus does three im-

proper things—(1) it violates the fundamental rule of fairness that prohibits the use of such facts, (2) it gets at them by hearsay only, and not by trust-worthy testimony, and (3) it leaves the other person no means of defending himself by denial or explanation, such as he otherwise would have had if the rule had allowed that conduct to be made the subject of an issue.''

And the same author in Sections 195 and 1117 of the same work states emphatically that if specific acts of misconduct are brought out ''the defendant should certainly be allowed to deny or explain it.'' Underhill, supra, Sec. 141, says:

''Where it appears from the cross-examination of a character witness that he had heard that the accused had trouble with his neighbors, the accused may bring out all the facts in order to show what the trouble was about and that he was not at fault.''

In the case of Abernethy v. Commonwealth, 101 Pa. St. 322, a character witness was asked whether he had heard that the defendant had been sent to the reform school, to which the witness answered that he had heard that he went there of his own accord. The defendant then offered to prove that he went to the reform school for the purpose of securing his maintenance and education in the absence of support by his father, and the rejection of this testimony was held error. In Olive v. State, 11 Nebr. 1, 27, 7 N. W. 444, the court held that cross examination as to specific acts of misconduct should not have been admitted, and that the error was enhanced by refusing to permit the defendant to show the circumstances thereof. The point under discussion was considered at length in the case of State v. Doris, 51 Or. 136, 94 Pac. 44, 16 L. R. A. (N. S.) 660, and it was held that when specific acts of misconduct are brought out on cross examination, the inquiry ''necessarily creates an issue concerning which further sifting may be proper and essential by the person whose character is by

98

this specific means brought in question'' and that he is entitled to explain the nature thereof and that he was not at fault. See also State v. People, 85 N. Y. 390, and Tippet v. State, (Tex. Crim.) 39 S. W. 120. In some cases, of course, the specific acts brought out may not be of sufficient importance to require an explanation, or to make the rejection of the explanation erroneous, and in any event the explanation should be confined within reasonable limits, largely within the discretion of the court, so as to avoid the trial of collateral issues as much as possible. But we think it clear that the rejection of the proffered offer in the case at bar was harmful and prejudicial.

■ Walter Fleming, who claimed to be a brother of deceased, was an important witness for the state, and among other things testified that the defendant had offered him a bribe of $1500, if he could get the case dismissed. On March 27, 1927, he wrote a letter to Mr. Wehrli, the prosecuting attorney, in which he stated that he would be present at the trial of this case; that he was not bought off by defendant and could not be bought off and that he wanted to see the defendant punished, and ''the more I think how dirty he done my brother the madder I get.'' Again on April 2, he wrote to Mr. Wehrli, among other things, ''I want to see Thompson punished for the way he did my brother that was about the dirtiest deal a man ever got from another man and if there is a law to punish a man for that he should be punished. * * * You can depend on me to do my part with you.'' He added a postscript asking whether he could not start a civil suit against the defendant after the trial. Despite these, apparently bitter, letters, he wrote to the defendant on March 28, 1927, stating that the deputy sheriff had been to see him, serving a subpoena on him to be present at the trial, and, among other things, that Mr. Wehrli had said ''that he would have to have me as a witness in order to get a conviction against you. Mr. Norred said unless I was there, the district judge would throw it out of court, unless I am there to push it.''

In a postscript he wanted defendant to ask Mr. Murane whether he would have to come, the tone of the letter generally indicating that he did not want to testify in the case. The court refused to permit the last mentioned letter to be introduced in evidence, because the witness was apparently "just trying to smooth the way with Mr. Thompson." Perhaps so, but the letter is capable, we think, of another inference. His postscript to the letter of April 2 clearly shows that he had in mind that he wanted to get some money out of the defendant. What was the motive of indicating in the letter to the defendant that the state had no case against the latter, outside of the testimony of the writer of the letter? That, it would seem, was a poor way of smoothing the way, in view of the fact that he appeared as a witness, and on the contrary would seem to have been an indirect method of indicating that he wanted the defendant to pay him not to come. If that is the inference that might be drawn from the letter, and we think it may, then it has the effect of contradicting his statement that the defendant attempted to bribe him. We think the letter should have been admitted in evidence.

■ On July 13, 1927, in support of the additional motion for a new trial herein, there was filed in the case an affidavit by the witness Walter Fleming just mentioned. The affidavit is of considerable length. We need not go into the contents thereof except in the following particular: He then swore, before a notary public, that he had testified falsely in the trial of the case in stating that the defendant had told him that he had killed the deceased, in stating that the defendant had told him that he had been drinking on the evening of January 30, 1927, and in stating that the defendant had offered him $1500. It was also shown that this affidavit was made by Fleming voluntarily coming to the office of Judge Murane, telling him that he had sworn falsely, and that it was obtained at the earliest possible moment. It is urged that the court should have granted a new trial because thereof. There was no direct contradic-

tion of the contents of the affidavit of Fleming, although an attempt was made indirectly, particularly by showing that the statements made by the witness corresponded to the statements made to the prosecuting attorney immediately preceding the trial. As to whether or not a new trial should be granted for newly discovered evidence of this character is discussed in 16 C. J. 1188-1190, and the rule seems to be that it depends on the circumstances of each case. Among other things it is there said that recanting testimony is unreliable, and that a new trial should be denied, if the court is not satisfied that such testimony is true. An annotation in 33 A. L. R. 550 reviews the cases on the subject, from which it appears that courts have frequently granted a new trial where perjured testimony, vital in the case, appeared, but more frequently have denied it, particularly if the testimony of the witness was not vital. In the instant case the testimony as to the admission by the defendant that he killed or hit the deceased, and the testimony as to the bribery, was important, and in view of the fact that the case was largely one of circumstantial evidence, we are not able to say that the jury would have convicted the defendant in the absence thereof. The court doubtless believed that Fleming told the truth on the witness stand, and in view of the better opportunity of the trial judge to know that fact, we should, perhaps, ordinarily feel bound by his ruling. But taking all the things heretofore discussed into consideration, we think that a new trial should have been granted.

For the errors herein pointed out, the judgment of the trial court is reversed and the cause remanded for a new trial.

*Reversed and Remanded.*

KIMBALL and RINER, JJ., concur.