# ESPY ET AL. v. STATE

(No. 2079; July 11, 1939; 92 Pac. (2d) 549)

292

294

For the plaintiffs in error there was a brief by *E. E. Enterline* of Casper, and *H. Glenn Kinsley* of Sheridan, and oral arguments by *Messrs. Enterline* and *Kinsley.*

For the defendant in error, there was a brief by *Ray E. Lee,* Attorney General; *Thomas F. Shea,* Deputy Attorney General; and *William C. Snow,* Assistant Attorney General, all of Cheyenne, and oral argument by *Mr. Shea.*

298

*E. E. Enterline, Madge Enterline* and *H. Glenn Kinsley* in reply.

KIMBALL, Justice.

The defendants, Robert Espy and Mike Chapman, charged with murder in the first degree in killing William Bears, were found guilty of murder in the second degree, and bring the case here for review by proceeding in error.

The killing occurred on September 11, 1937, at the small town of Arvada, Sheridan County, where several hundred persons were present to enjoy games, dancing and a barbecue. There was dancing on two dance floors, one at the Community Hall, and the other a short distance away in the open air. Joe Geiger was "master of ceremonies" in charge of the entertainment. He had employed William Bears, the deceased, who, during the afternoon, operated a sound amplifying device. The defendants are brothers-in-law and associated in the livestock business on a ranch a few miles from Arvada. Chapman was also owner of a gambling place at Sheridan. Espy arrived at Arvada about noon and Chapman about 8:30 in the evening of the day of the homicide. Chapman was accompanied by the witness Lewis who intended to spend the week-end at Chapman's ranch. The defendants and Lewis had been drinking during the afternoon and evening, but asserted that they were not drunk. Before this day Chapman had seen Bears several times, but they had never spoken to each other. Espy had never seen Bears before. Bears was 26 years old, 6 feet 3 inches tall, and weighed 186 pounds. Espy was 35 years old, 5 feet 6 inches tall and weighed 122 pounds. Chapman was 45 years old and weighed 165 pounds.

About eleven o'clock in the evening Bears and his wife decided to return to their home at Sheridan, but wanted first to find Geiger and collect what was due Bears for his work during the day. Looking for Geiger they went to the Community Hall where Mrs. Bears accepted Chapman's invitation to dance. She testified that Chapman was drunk, and that after they had

danced twice around the hall, Bears separated them and made a "pass" at Chapman. Witnesses, McDermott and Sampson, interfered and escorted Bears and his wife from the hall. McDermott saw Bears swing at Chapman, but was not sure that Chapman was struck. Sampson thought he was. Chapman himself testified that Bears hit him on the head two or three times, but that he was not hurt, the blows left no mark and he was not angry, insulted or indignant.

Mrs. Bears testified that after she and her husband left the Community Hall they went to the open-air dance platform still looking for Geiger. Before Geiger was found, Mr. and Mrs. Bears separated, she to move their automobile from the parking place to the highway, while he continued to look for Geiger. Bears soon found Geiger in the crowd near the open-air dance platform. What then happened was told by witnesses whose testimony we undertake briefly to summarize.

Joe Geiger, the main witness for the state, testified: He and Bears were talking when Geiger saw Chapman looking toward them. Geiger thought Chapman was looking at him and assumed that Chapman wanted to speak to him about payment for two beeves Chapman has furnished for the barbecue. Geiger walked toward Chapman, and when they were a few feet apart, Chapman, who as it then appeared was looking at Bears, took a step to the right, called Bears vile names, and threw a bottle at him. The bottle missed Bears who was standing flat-footed and grinning. Chapman and Bears then advanced toward each other, as thought to fight with their fists, until they were within striking distance. Then Chapman started backing away, and after he had retreated a few feet, defendant Espy, with a club in his hand, ran out from the shadow of a lunch room to a point behind Bears whom Espy then struck with the club three times on the back of the head. Geiger, at the third blow, rushed in to interfere and

Espy struck at him, but he dodged, throwing himself partly on the ground, and the club hit only his hand and hat. After the second blow and before the third, Bears was standing with his feet spread, weaving back and forth. At the third blow Bears fell prone and unconscious in front of Chapman. Espy then struck Bears a fourth blow, and after Chapman had said, "Give him another one," struck the fifth and last blow with the club. Chapman then kicked the prostrate Bears six or eight times in the forehead and eyes with the heel of his boot. Geiger yelled at Chapman, and the kicking stopped. Bears was taken to his car and driven home by his wife.

Bud Ryan was the only state's witness, besides Geiger, who testified that he saw all the blows. His testimony was not materially different from Geiger's except that he asserted that after Chapman threw the bottle and before Espy got the club Chapman signaled Espy by a "wink and a nod" which the witness illustrated to the jury in some way that could not be shown in the record. This witness, as shown below, recanted after the trial.

Geiger's testimony that Chapman kicked Bears after he was down was corroborated by the testimony of three children 10 or 11 years old. Two of these witnesses did not see the blows that felled Bears. The other testified that Espy struck three blows before Bears was "clear down" and that he didn't know how many blows were struck after Bears was down.

State's witness Vannoy testified that from some distance he "noticed a fellow being hit with a club," saw Geiger attacked when he tried to interfere, and saw Chapman kick Bears three, four or more times until somebody stopped him.

Another witness for the state saw Chapman kicking at Bears but couldn't see whether Bears was struck.

A witness for defendants saw Espy strike two blows

with the club—the first on the back of Bears' head, and the second from behind as Bears "staggered away from Espy." Asked whether Bears was struck with the club after he was on the ground, the witness replied, "Not that I saw. I wasn't watching it all the time." He saw Espy swing the club at Geiger who "came in" as Bears was "going to the ground." He saw Chapman kick Bears once, and the witness then left, as "that was enough for the lady friend" who was with him. This witness admitted that at the coroner's inquest he stated that he did not have anything to add to the testimony of Geiger who he believed had "covered [the fight] about as thoroughly as it could be covered."

Another defense witness testified he was standing beside Bears when Bears, as though threatening a fist fight, threw up his hands towards Chapman who then was ten or twelve feet away and going the other way. Bears said to Chapman, "Now, looky here Mike," and Chapman whirled around and threw the bottle at Bears who "went on ahead" until he was hit twice by Espy. He saw Bears start to fall after the second blow, but couldn't see him after he fell. He testified that Espy didn't strike Bears after he fell, and he didn't see Chapman kick Bears, but saw him kick at him.

Another defense witness testified that he sold a bottle of pop to Chapman who, with another man (Lewis, according to other defense evidence) and Espy, was standing nearby, when Bears "came up there with a mad look on his face." Chapman said, "What do you want to jump on me for?", and Bears replied, "I'll whip both of you sons of bitches," and rushed at them, striking with both hands. That "they," (meaning Espy and Chapman and probably Lewis) then ran from Bears back into the crowd, and the witness couldn't see what happened afterwards.

The only other witnesses who testified that they saw the fatal encounter were the two defendants and Lewis.

Defendant Chapman testified: After the altercation in the Community Hall he stayed in the Hall a few minutes; then visited with friends at their automobile; then returned to the Hall and danced two dances; then started toward the open-air dance platform and met Lewis from whom he had been separated for some time. They went to the pop stand where Chapman bought a bottle of coco cola. Espy joined them. This was 25 or 30 minutes after the altercation in the dance hall. Bears came into sight and Chapman said, "There is the man that hit me over the head at the dance hall for dancing with his wife." Bears "immediately charged toward them, seemingly angry," saying "I'll whip both of you sons of bitches," and striking towards Chapman and Espy with his hands. Chapman backed up "quite fast" and threw the pop bottle at Bears. The bottle slipped and he missed. He then retreated because he "was afraid of this Bears," whose demeanor was "angry." While Chapman was retreating, Bears was "charging" Espy who so far had made no gesture toward Bears. Chapman did not see Espy procure or have the club nor did he see Espy strike Bears. Chapman stopped retreating when he came to an automobile parked at the dance platform, turned around and saw Bears falling at his feet. Knowing nothing of the blows that had felled Bears, Chapman thought Bears was trying to get hold of him, and "got out over Bears." Chapman denied that he kicked Bears, or made any attack except by throwing the bottle. As he jumped over Bears, he saw Geiger "run up there going after" Espy, and saw Espy act as though he was going to hit Geiger, "but some one interfered." Until then, Chapman had not seen Espy since the pop bottle was thrown. Chapman denied that the attack was pursuant to an understanding between him and Espy, or that Espy had the club at Chapman's instigation or request.

Defendant Espy testified: He saw Chapman and

Lewis near the pop stand where he joined them. Chapman, seeing Bears some 12 or 14 feet away, pointed at him, saying, "That's the fellow that hit me up at the dance hall." This was the first information Espy had of the dance hall episode. Bears then approached, drew back his right hand and said "I'll whip hell out of both you sons of bitches." Espy backed away, Bears after him. After Espy had taken 3 or 4 steps backward, his foot touched a stick which he picked up as quickly as he could, and met Bears with it. He hit Bears as Bears was coming toward him hitting and grabbing at him. Bears appeared to be "mad." The witness hit Bears twice to "stop him from coming towards me." Asked if he was afraid of Bears, he answered, "Yes; I would say I was a little scared of him." Asked, "Were you at that time afraid he would do you great bodily harm or injure you by his attack?", he answered, "I knew he could if he got hold of me." Just before Espy's foot touched the stick, Chapman, who was beside him, threw the bottle; but Bears continued to come towards Espy, who struck Bears three blows with the club. Espy denied that he intended to kill Bears, stating: "All I wanted to do was stop him." After the first blow, Bears kept coming. The second blow missed Bears' head and struck his shoulder. The third blow hit Bears squarely in the face. Bears' knees sagged, he took a step forward and fell with his head near Chapman. Espy said he did not strike Bears from behind, or after he fell. Espy ran to meet Geiger, struck at him, but missed him, and Geiger staggered back and almost fell down. Then Espy backed to where he had been before and found Chapman by his side. He didn't think Bears was badly hurt. He testified he did not see Chapman kick Bears, and pressed on cross-examination as to why he had not, answered, "I was looking in another direction."

Lewis, witness for defendants, testified that when

Bears approached the defendants, he stepped on the dance platform and saw all that happened. His testimony was in substantial agreement with that of Espy and Chapman. He testified that Bears was struck only two blows, both on the front of the forehead dealt by Espy while backing away, and that after Bears fell, he was neither struck nor kicked, but that Chapman merely stepped over the body.

The seriousness of Bears' wounds was not known until the next morning. His skull was fractured, and after lingering in an unconscious or semi-conscious condition, he died on September 30. From testimony of the doctors who treated him and made a post mortem examination, there could be no doubt that the death resulted from blows on the head that fractured the skull and injured the brain. The fracture of the skull extended from the top of the head to the bridge of the nose, with a branching fracture extending over the right eye. There were many bruises. The right eye was black and swollen entirely closed. There were 6 or 8 "bruised areas" on the top and back of the head evidenced by "rounded elevations"—"about as many bruises as could be gotten in that space." The hair on the head was thick and the scalp had not been cut. There was also a bruise about four inches in diameter on the back of the left hip.

The club identified by state's witnesses as the one used by Espy, is a piece of sawed lumber, commonly called 2 by 4, about 2 feet long. Five inches from one end it had been sawed half way through and a piece 2x2x5 inches removed leaving at that end a rather convenient hand hold.

The above statement contains the substance of the evidence bearing on the question whether Espy acted in defense of himself or of Chapman, and on the question of Chapman's participation in the fatal assault. It is not surprising that the jury found in favor of the

state on both questions, and we do not think that any other jury, regardful of their oaths, would return a verdict of not guilty. Bears, as the aggressor in the affray at the Community Hall, had given no ground for belief that he intended to do Chapman any great bodily harm. The blows then struck had caused no injury. He was unarmed and made no threats of renewing the assault. If he was the aggressor in the later and fatal encounter, he was threatening only to whip the two defendants in a fist fight in the midst of a crowd of people. See Durham v. State, 29 Wyo. 85, 93, 210 Pac. 934; Roddie v. State (Okla. Cr.) 198 P. 342, 348; State v. Elliott, 98 Mo. 150, 11 S. W. 566. To justify a killing on the ground of self-defense it must appear that the defendant had reasonable grounds for believing, and did believe, that he was in danger of losing his life or of suffering serious bodily harm, and that it was necessary for him to act as he did to protect himself from such apprehended danger. Durham v. State, supra, at p. 96; Loy v. State, 26 Wyo. 381, 389-390, 185 Pac. 796. If the defense evidence on this subject had been uncontradicted, we doubt that the jury would have found that Espy actually believed, and had reasonable grounds for believing, that it was necessary for him to strike Bears as he did to prevent any threatened serious harm either to him or to Chapman. Assuming that Bears was the aggressor, the counter attack was unfair and excessive. There could be little doubt that Bears was disabled by blows struck with the club from behind. He was a young, large, powerful man. It is not likely that he could have been struck so effectively on the head if he had been in a position to see Espy pick up and swing the club. The only complete corroboration of the testimony of Chapman that he did not continue the assault after Bears was on the ground and helpless, came from Chapman's friend, Lewis. The number of bruises on Bears' head could be

accounted for only by believing the witnesses who testified that he was struck with the club or kicked after he was down. We think it clear from the evidence that defendants were guilty of an unlawful killing, and that the only serious doubt was whether the crime was murder or manslaughter. See State v. Davidson, 95 Mo. 155, 8 S. W. 413. Errors which in a more doubtful case might be grounds for a new trial, may be disregarded as not prejudicial. See State v. Vines, 49 Wyo. 212, 241, 54 P. (2d) 826, 836.

Counsel who represent defendants in this court did not participate in the trial. Some of the assignments of error refer to evidence, instructions or remarks of court or counsel to which no objections were made or exceptions taken. The rule that to secure a consideration in this court of alleged errors occurring upon the trial, timely objection must be made and exceptions taken, should not be departed from except in extreme cases. See Loy v. State, 26 Wyo. 381, 385, 185 P. 196; Omaha v. State, 24 Wyo. 513, 518, 161 P. 558. The reasons for relaxing the rule in some cases, most of which are reviewed in McFetridge v. State, 32 Wyo. 185, 201-209, 234 P. 505, do not exist in the case at bar. Assignments of error pointing to rulings or conduct that did not seem objectionable to defendants' counsel at the trial need not be discussed.

It is contended that defendants were prejudiced by the prominence given to the fact that defendant Chapman and witness Lewis were professional gamblers. When the jurors were being questioned as to their qualifications, defendants' counsel asked each juror whether he would discredit or disregard the testimony of any witness merely because he might be a gambler, and each juror answered "No." Chapman, on direct examination, being asked his occupation, answered that he was in the stockraising business. On cross-examination, being asked if he had any other business, he

answered, "None at all." The question was then repeated in somewhat different form, and he answered: "I make money other ways, gambling some." There was no objection until he was asked where his gambling activities took place. An objection to this question on the ground that it was improper cross-examination was overruled, and the witness answered: "I would say I owned a place here in Sheridan." Chapman on cross-examination was asked the business of Lewis. There was no objection, and the witness answered that Lewis had said he worked for an implement company, but "he was a twenty-one dealer at the Crescent hotel when I knew him." Lewis, on direct examination, being asked what business he was engaged in at the time of the homicide, testified that he was gambling—part owner of a "joint" at the Crescent Hotel Bar. When he gave this testimony, the trial judge said: "Mr. County Attorney, you ought to take cognizance of that fact. Gambling is prohibited by statute in this state and when things like that come out in a public trial the public officials should take cognizance of it." The witness was still on the stand when the trial was adjourned until the next day. After adjournment and after the jury had left the court room, Lewis was placed under arrest by the sheriff, and when the trial was resumed the following morning the witness came into court accompanied by the sheriff. We may assume that the jurors knew of the arrest, though there may be doubt that their knowledge was shown by competent evidence. There was no objection when the attorney for the state, in the closing argument, made frequent reference to the fact that Chapman and Lewis were gamblers, and argued that they were less worthy of belief than state's witness Geiger.

That both Chapman and Lewis were professional gamblers was proved by their admissions on direct examination after having been forecast by the exam-

ination of the jurors by defendants' attorneys. Defendants are not in a position to complain because the jury had this information. It is contended, however, that it was error for the judge to call the attention of the county attorney to the matter in the presence of the jury and for the county attorney to cause the arrest of the witness. The cited authorities show that in some circumstances it is held to be prejudicial error for the trial judge in the presence of the jury to discredit a witness by ordering his arrest for bribery or perjury. 16 C. J. 835; State v. Hughes, 33 Kan. 23, 5 Pac. 381; People v. Mahach, 65 Cal. App. 359, 224 Pac. 130, 137. And see, McNutt v. United States, 267 Fed. 670, and cases cited at p. 674. In such cases the judge virtually told the jury that in his opinion the witness had sworn falsely. That was not true in the case at bar. It was not the action of the judge which affected the credibility of the witness, but his own confession, and the arrest was what the jury might have expected as a fitting sequence to the confession. People v. Hayes, 77 Hun. 111, 119-120, 24 N. Y. Supp. 194, aff'd. 140 N. Y. 484, 35 N. E. 951, 23 L. R. A. 830, 37 Am. St. Rep. 572. The remarks of the judge did not advise the jury of any fact they did not already know. Reynolds v. United States, 48 Fed. (2d) 672. See, also, State v. Roberts, 91 Wash. 560, 566, 158 P. 101, 103; State v. Ketter, 121 Kan. 516, 247 P. 430; State v. Severin, 58 N. D. 792, 228 N. W. 199, 202. Defendants made no objection to the remarks of the judge or to the arrest of the witness, and we may assume that they did not then think they were prejudiced by what was said and done.

Ordinarily, it is not necessary for the trial judge publicly to suggest the arrest of an important witness who confesses that he has committed a misdemeanor. In this case, there was danger that the matter of gambling would be unduly stressed. Chapman had confessed that he too was a gambler. The jury, we assume,

were entitled to consider that fact as affecting his credibility as a witness, but not as a fact tending to show that he was a man likely to commit murder. The action with respect to the witness Lewis gave undue emphasis to evidence which was in the case for a limited purpose. This, we think, should have been avoided; but in view of the evidence, and the disposition we make of the case, we hold that defendants were not prejudiced.

Defendant Chapman produced at the trial and introduced in evidence the boots which he said he was wearing at the time of the homicide. There were caps of thin, hard rubber on the heels, and Chapman testified that two days before the trial one of the rubber caps came off, and he had had both of them tacked on again at a repair shop. On cross-examination he stated that the heels had never been capped with steel plates. In the closing argument for the state, counsel said: "Maybe this is the set of boots he had on and maybe not. Maybe they were heavier boots than these. Maybe they had steel caps on these heels." At this point the defendants' attorney interrupted, saying: "Objected to as not within the record. An assumption not testified to." The judge then remarked: "The jury will recall the evidence." The state's attorney continued: "They were taken to the shoe shop the day before he brought them up here and introduced them in evidence. Whether he took something off of the heels and put these little pieces of rubber on, you gentlemen will make up your minds. But anyway, whether these were the boots, whether they were heavier boots, whether they had steel points on these heels, that is for you to say."

After the jury had retired defendants consented that the boots be taken to the jury room for inspection by the jurors. When the boots were returned from the jury room to the Court Reporter, the rubber heel caps had been removed from the heels. Defendants attached

to their motion for a new trial affidavits of three jurors stating the rubber heel caps were removed "to ascertain whether or not there had previously been steel plates or caps thereon." The state filed affidavits of the same three jurors each stating that "neither the boots nor the examination made of them, nor anything connected with them, had any prejudicial effect upon the rights of the defendants."

Though it is conceded that the boots were exhibits offered in evidence by defendants, and taken to the jury room with defendants' consent without any request for instructions to restrict the jury in their inspection, it is contended that the removal of the heel caps was misconduct of the jury. It is also contended that the state's attorney was guilty of misconduct in making the quoted remarks. The cases cited do not appear to be in point. In State v. Lindeman, 64 N. D. 518, 254 N. W. 276, 93 A. L. R. 1442, the jury examined articles which had been offered as evidence and rejected. In State v. Burke, 124 Wash. 632, 215 Pac. 31, it was held misconduct for the jury to examine exhibits with aid of a magnifying glass which was not in exhibit. The correctness of this conclusion may be doubted on authority of a later decision of the same court. State v. Everson, 166 Wash. 534, 7 P. (2d) 603, 80 A. L. R. 106. In People v. Conkling, 111 Cal. 616, 44 Pac. 314, the jury borrowed a rifle, bought some cotton drilling, and experimented to see how far powder marks would be carried. In Forehand v. State, 51 Ark. 553, 11 S. W. 766 (as explained in Moore v. State, 185 Ark. 1189, 49 S. W. (2d) 1041) the pistol of the deceased was carried to the jury room without the knowledge of defendant, and experiments made with it. In Wilson v. United States, 116 Fed. 484, the jury were instructed, over defendants' objection, to determine a fact essential to a conviction by experiments in the jury room.

An interesting discussion of the use of exhibits by

the jury is contained in Higgins v. Los Angeles Gas & Elec. Co., 159 Cal. 651, 115 Pac. 313, 34 L. R. A. (N. S.) 717, which is authority for the statement in 16 R. C. L. 300, that there is no ground for objection if the jury merely makes a more critical examination of an exhibit than was made of it in court. We do not think the removal of the heel caps from the boots can be called an experiment. It was a more critical examination which defendants should have anticipated when they consented that the boots be taken to the jury room. The only question that had been raised as to the condition of the boots was the matter of the heel caps. The authorities hold that a defendant cannot complain because the jury examines exhibits or even, according to some cases, makes experiments with exhibits taken to the jury room with defendant's consent. See Taylor v. Commonwealth, 90 Va. 109, 17 S. E. 812; People v. Mahoney, 77 Cal. 541, 20 Pac. 73; State v. Allen, 23 Mont. 118, 57 Pac. 725; Hopkins v. State, 9 Okla. Cr. 104, 130 Pac. 1101; Saunders v. State, Okla. Cr. 264, 111 Pac. 965.

Counsel for the state in commenting on this subject in his address to the jury did not misstate the evidence. He at most asked the jury to draw an unwarranted inference of a fact not necessary to be shown to establish guilt. We cannot hold that this was prejudicial misconduct. See Behler v. State, 112 Ind. 140, 13 N. E. 272; Spahn v. People, 137 Ill. 538, 27 N. E. 688; People v. Amaya, 134 Calif. 531, 66 Pac. 794.

Over defendants' objection, the court gave the jury this instruction: "If you believe the deceased was assaulted by Chapman and Espy, or either of them, in pursuance of a design or understanding between them to kill or seriously injure the deceased, then each is responsible for the acts of the other in carrying out such design."

The objection is on the ground that there was no

evidence that defendants acted in pursuance of a design or understanding, except the testimony of Bud Ryan that Chapman signaled to Espy by "a wink and nod." Ryan, as explained below, recanted. We think the jury could have rejected his testimony, and from other evidence have drawn the inference that defendants acted in pursuance of an understanding between them. The very fact that they were together and prepared to attack so promptly with bottle and club would seem sufficient. The jury were not bound to believe Chapman's statement that he was holding the bottle with no purpose, or Espy's that he accidently ran on to and picked up the club while hotly pursued by Bears. Besides, if defendants were aiding and abetting each other in what they did, a previous understanding was not necessary to be shown to render each accountable for the other's acts. Wyo. R. S. 1931, § 32-1101; Berry v. State, 51 Wyo. 249, 258-262, 65 P. (2d) 1079; Radke v. State, 17 Okla. Cr. 230, 187 Pac. 500; State v. Gooch, 105 Mo. 392, 16 S. W. 892; 29 C. J. 1067; note, 12 A. L. R. 275.

There was also objection and exception to the giving of instruction No. 21, as follows:

"If the person assailed is without fault and in a place where he has a right to be and is put in reasonably apparent danger of losing his life or receiving great bodily harm, he may stand his ground and repel force with force and if, in the reasonable exercise of his right of self-defense, kills his assailant he is justified. However, in repelling force with force the person assailed is justified in using only sufficient force as reasonably appeared necessary at the time and under all the circumstances to save his life or to protect himself from great bodily harm. He may not after his assailant is clearly disabled go further and inflict deadly blows upon him.

"And so in this case, if you find that the defendant

Espy was acting in justifiable self-defense in striking the deceased on the head with a club or stick, and that he thereupon sank to the ground helpless and unable to do the defendants injury, but you also find beyond a reasonable doubt that while he remained helpless and unable to do the defendants injury the defendants inflicted blows upon the deceased which materially contributed to his death, then they would be guilty of manslaughter and you should so find."

It is contended that the instruction was erroneous in predicating the right of self-defense on the defendant being "without fault and in a place where he had a right to be." Parker v. State, 24 Wyo. 491, 503, 161 P. 522 and State v. Radon, 45 Wyo. 384, 399, 19 P. (2d) 177, are cited in support of the contention. The instruction considered in Parker v. State was erroneous in several particulars. The jury were told, among other things, that "to justify and excuse homicide a person must be in the lawful pursuit of his business and without blame," and the court said this was too broad a statement. The case was reversed because from an examination of the whole record, showing several errors, the court was convinced that the defendant, convicted of a capital offense, had not had a fair trial. In State v. Radon, instructions which contained, among other things, the statement that "the defendant must be without fault in bringing on the difficulty," were condemned as having no application under the evidence. In that case defendant and deceased had quarrelled some time before the shooting. It was held that instructions referring to the defendant's fault in provoking the difficulty were prejudicial because, under the evidence, they had the effect of declaring that defendant was deprived of the right of self-defense if in the previous quarrel he had been at fault in making a taunting remark which was not calculated to lead to an affray.

It is commonly stated that to justify taking life in self defense the killer must be without fault in bringing on the difficulty, and ordinarily an instruction containing a statement to that effect is not subject to criticism, though, as in State v. Radon, supra, the statement may be misleading under the special facts of a case. See 1 Bishop on Criminal Law (9th ed.) § 865, note 2. The unqualified statement that the person assailed "must be without fault and in a place where he has a right to be" may be incorrect. See State v. Leaks, 114 S. C. 257, 103 S. E. 549, 10 A. L. R. 858, and note; Hanns v. State, 72 Neb. 288, 100 N. W. 419, 9 Ann. Cas. 1130 and note. But we think the statement was no prejudicial error in the case at bar. Instruction No. 21 was preceded by an instruction showing clearly that the "fault" referred to was fault in bringing on the difficulty that resulted in the killing. It was not contended that Chapman was the aggressor in the encounter at the Community Hall, and the instructions stated more than once that the deceased then assaulted Chapman. There was no evidence from which the jury could have found that defendants were in a place where they did not have a right to be.

Instruction 21 is further criticized because it assumes there was evidence from which the jury could find that defendants inflicted on Bears "deadly" blows, or blows "which materially contributed to his death" after he was helpless. From evidence recited above there is no doubt that the jury had a right to believe Bears was struck on the head after he was helpless. Counsel probably intend to assert only that there was no evidence to justify the inference that such blows materially contributed to the death. They apparently take the position that one of the blows struck by Espy before Bears fell must have caused the skull fracture and brain injury, and that the evidence did not show that subsequent blows or kicks were a contributing

cause of death. We do not say that the jury, even without expert evidence on the subject, would not have been justified in believing that blows on an already fractured skull contributed to and hastened the death that resulted from the brain injury. There was expert evidence to confirm that view. We find in the testimony of the physicians statements like these: The bruises might have caused death even though there had been no fracture of the skull. The fracture could have been caused by one or several of the blows. Injuries other than the fracture had a great part in causing death.

It is contended that the last paragraph of instruction 21 is incorrect. Counsel say the correct rule is stated in 30 C. J. 353 on authority of Miller v. State, 37 Ind. 432. That if the blows that caused death were struck in self defense, and other blows not mortal were afterwards struck, not in self defense, the defendants are not guilty. This statement seems to assume that the blows struck in self defense were the sole cause of death—that the later blows were not a contributing cause. The instruction states the correct principle applicable in the stated situation as shown by numerous authorities. Wharton on Homicide (3d ed.) Sec. 32; 2 Bishop's Crim. Lam (9th ed.) Sec. 637; Rogers v. State, 60 Ark. 76, 29 S. W. 894, 46 Am. St. Rep. 164, 31 Y. R. A. 465; Maddox v. State (Tex. Cr. App.) 173 S. W. 1026; Almond v. People, 55 Colo. 425, 135 Pac. 783; People v. Brown, 62 Cal. App. 96, 216 Pac. 411.

In the closing argument, counsel for the state stated: "Gentlemen of the Jury, to-day I haven't a doubt that thousands of men and women in Sheridan County, decent men and women, whose eyes are all upon you—" when he was interrupted by objection that the argument was outside of the record. The court remarked: "Please confine yourself to the record." Defendants took an exception, and counsel for the state repeated: "The eyes of the citizens of this county are upon you

* * *," when he was again interrupted by an objection that the argument was outside the record and prejudicial. The Court said: "Proceed," and defendants again excepted. From counsel's argument preceding and following these objections, it may be that the jury were given to understand that the people were expecting and demanding a verdict of guilty, and that an acquittal would meet with public disapproval. We may assume that an appeal for conviction based upon that ground would be improper. See, Ross v. State, 8 Wyo. 351, 371, 57 Pac. 924. If the evidence in this case were not so convincing of defendants' guilt of manslaughter, we might have to hold that such an appeal was prejudicial error. See People v. Maurilla, 189 App. Div. 809, 179 N. Y. Supp. 290; People v. Dabney, 315 Ill. 320, 146 N. E. 166; Sizmore v. Com., 210 Ky. 637, 276 S. W. 524. As we approve the verdict as a conviction of manslaughter only, we hold that the remarks of counsel were not prejudicial.

State's witness Bud Ryan testified that on the day before he appeared as a witness at the trial he had been released from jail at Buffalo, Wyoming, and that he had spent the following night in jail at Sheridan, though not under arrest on any charge. He testified that he was with Bill Suranyi at the scene of the fight, and saw the fight from beginning to end. His testimony corroborated that of Geiger in important particulars, and was the only testimony that Espy got the club and entered the fight after a signal from Chapman. Ryan's subsequent recantation was made a ground of the motion for a new trial. The facts were shown by affidavits attached to the motion. The state made no counter showing, but in an affidavit of attorneys it was stated that Ryan corroborated the testimony of other witnesses for the prosecution, and that no ground for his impeachment was laid in his cross-examination. The contention that this ground of the motion presented

merely a question of impeachment of a witness was not tenable. People v. Shilitano, 218 N. Y. 161, 112 N. E. 733, L. R. A. 1916F, 1044. Suranyi, in an affidavit attached to the motion, stated that he and Ryan were together at Arvada practically all the time on the night of September 11, and were not together at the fight, they drove home together about 2 o'clock the following morning; Ryan that night said nothing about having seen the fight, and the next day said he had not seen it. Another affiant stated that after Ryan had testified and before the end of the trial, Ryan said in affiant's presence: "I had to testify in that case. If I had not testified as I did and lied, they would have put me in jail." Ryan himself made affidavit that he "did not see the fight between [Chapman, Espy and Bears] which was supposed to have taken place on September 11, 1937, at Arvada, Wyoming." His affidavit gave no reason for his having testified falsely. The state has not claimed that any of the facts recited in the affidavits were known to defendants until after the trial.

Recanting testimony is viewed with suspicion, and when the trial judge, acting on a motion for a new trial, refuses to believe it, the appellate court, ordinarily at least, will feel bound by the decision. See Thompson v. State, 41 Wyo. 72, 99-100, 283 Pac. 151. In the case at bar the recanting affidavit was in some measure corroborated by the affidavit of Ryan's companion, and perhaps by the fact that Ryan came from jail to testify at the trial. We are inclined to think that in ruling on this ground of the motion for a new trial, the judge did not decide that Ryan told the truth at the trial, but denied the motion because he believed that the jury, without Ryan's testimony, would have returned a verdict finding defendants guilty, and that another trial would not result in an acquittal. See Paseo v. State, 19 Wyo. 344, 351-352, 117 Pac. 862; Ryal v. State, 16 Okla. Cr. 193, 182 Pac. 253; Shepherd v. State (Okla.

Cr.) 300 Pac. 421, 425; State v. Sheltrey, 100 Minn. 107, 110 N. W. 353, 10 Ann. Cas. 245; Larrison v. United States, 24 F. (2d) 82, 87. We should not hold that the trial judge's decision on this point was not justified. We are of opinion, however, that the jury might have found defendants guilty of manslaughter, instead of murder, if Ryan's testimony had been omitted. They may have been induced to find the malicious purpose to kill, necessary in murder in the second degree, by Ryan's testimony that Chapman gave a wink and a nod as a signal for Espy to attack.

Counsel for the state in argument to the jury, commented at some length on the fact that no witnesses had been produced to testify that Chapman's reputation as a law abiding citizen was good. This, according to most authorities, (Hudson v. State, 35 Del. 23, 156 Atl. 881, 80 A. L. R. 219, and note) was error, but not ground for a new trial, as there was no objection. We mention the matter here as an additional reason for believing we do no injustice to the state by holding that it must elect to have a new trial or allow the verdict to stand as a conviction of the lesser and included crime, manslaughter.

As we find no error that can be held prejudicial to defendants on the question of their guilt of manslaughter, and believe the verdict of murder in the second degree may have been the result of perjured testimony and unfair argument to the jury, we follow the precedent set in State v. Sorrentino, 31 Wyo. 129, 224 Pac. 420, and State v. Flory, 40 Wyo. 184, 276 Pac. 458, and shall order that the State may elect by writing, filed in this court within thirty days, to take a new trial, in which event the judgment will be reversed and the cause remanded for a new trial. Unless that is done, the judgment will stand reversed as to murder in the second degree and affirmed for manslaughter, and the case will be remanded to the District Court with direc-

tion to cause the prisoners to be brought before it to be re-sentenced for that crime, and to make all other orders not inconsistent herewith.

RINER, Ch. J., and BLUME, J., concur.